**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| TONIA THOMPSON | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 16-2496-DDC |
| | ) | |
| TYSON FOODS, INC. | ) | |
| Defendant | ) | |

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff Tonia Thompson, through counsel, and provides the following

facts, arguments, and authorities to show why the Court should Deny the Motion for Summary

Judgment (Doc. 37), Defendant Tyson Foods, Inc. filed by on September 23, 2016.

**SUBMITTED BY:**

Kenneth D. Kinney, D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 250
Kansas City, Missouri 64112
Telephone: (816) 298-0086
Fax: (816) 2978-9455
Email: ken@rklawllc.com

Kirk D. Holman, KS #19558
HOLMAN SCHIAVONE, LLC
4600 Madison Avenue, Suite 810
Kansas City, Missouri 64112
Telephone: (816) 283-8738
Fax: (816) 283-8739
Email: kholman@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .......................................................................................................................1

LEGAL STANDARD...................................................................................................................2

PLAINTIFF'S RESPONSES TO TYSON'S STATEMENT OF MATERIAL FACTS ..............3

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ...................................33

ARGUMENT AND AUTHORITIES ........................................................................................55

CONCLUSION...........................................................................................................................81

# TABLE OF AUTHORITIES

**CASES**                                                                                    **PAGE**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)................................56, 57

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171 (10th Cir. 1999) ................................70

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................2

*Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193 (10th Cir. 2006)................77

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) ........................56, 63, 71, 72

*Daniels v. UPS, Inc.*, 701 F.3d 620 (10th Cir. 2012)....................................................71

*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000)................................79

*Ellison v. Sandra Nat'l Laboratories*, 60 Fed. Appx. 203 (10th Cir. 2003)................................79

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ........................................55, 56

*Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217 (10th Cir. 2008) ................................69, 71, 76

*Golleher v. Aerospace Dist. Lodge¸*122 F.Supp.2d 1056 (8th Cir. 2000) ......................................2

*Guess v. Bethlehem Steel Corp.¸*913 F.2d 463 (7th Cir. 1990)....................................................63

*Hanna v. Boys and Girls Home and Family Servs., Inc.*,
  212 F.Supp.2d 1049 (N.D.Iowa 2002)................................................................64

*Hostetler v. Quality Dining, Inc.*, 218 F.3d 798 (7th Cir. 2000)................................62, 63

*Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir. 2011) ......................................60, 67

*Jones v. Wichita State Univ.*, 528 F.Supp.2d 1222 (D.Kan. 2007)................................55

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir. 2005)....................................72

*Kentworthy v. Conoco, Inc.*, 979 F.2d 1462 (10th Cir. 1992) ......................................79

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997)..............................................72

*Lyons v. England*, 307 F.3d 1092 (9th Cir. 2002)......................................................73

*Marx v. Schnuck Markets, Inc.¸*76 F.3d 324 (10th Cir. 1996) ................................72, 76

i

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) ..........................................................55, 56

*National RR Corp. v. Morgan*, 536 U.S. 101 (2002) ............................................................72, 73

*Noland v. City of Alberquerque*, 779 F.Supp.2d 1214 (D. N.M. 2011) ........................................75

*Nordike v. Verizon Bus., Inc.*,
     No. 12-2686-JAR, 2014 WL 4749185 (D.Kan. Sept. 24, 2014) ................................72, 76

*Orr v. City of Alberquerque*, 417 F.3d 1144 (10th Cir. 2005) .......................................................79

*Pryor v. United Air Lines, Inc.*, 791 F.3d 488 (4th Cir. 2015) ......................................................67

*Reeves v. Sanderson Pluming Products, Inc.*, 560 U.S. 133 (2000) ...................................2, 70, 80

*Roberts v. Roadway Express, Inc.*, 149 F.3d 1098 (10th Cir. 1998) .................................71, 72, 76

*Santiago-Ramos v. Centennial PR Wireless Corp.*, 217 F.3d 46 (1st Cir. 2000) ..........................78

*Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255 (10th Cir. 2003) .............................57, 60, 68

*Sims v. Health Midwest Physician Services Corp.*, 196 F.3d 915 (8th Cir. 1999) .................57, 59

*Smith v. Sheahan*, 189 F.3d 529 (7th Cir. 1999) .........................................................................57

*Steiner v. Showboat Operating Co.*, 25 F.3d 1459 (9th Cir. 1994) ..............................................63

*Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160 (10th Cir. 2007) .........................70, 71

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ...................................................................70

*Tolan v. Cotton*, 134 S.Ct. 1861 (US 2014) .................................................................................2

*Tomsic v. State Farm Mutual Auto Ins. Co.*, 85 F.3d 1472 (10th Cir. 1996) ...............................70

*Torres v. Pisano*, 116 F.3d 625 (2nd Cir. 1997) .........................................................................57

*Tucker v. Aramark Corp.*, No. 13-2574-JTM, 2015 WL 78188 (D.Kan. Jan. 6, 2015) ...............71

*Vance v. Ball state University*, 133 S.Ct. 2434 (U.S. 2013) ...................................................56, 58

*Young v. Bayer Corp.*, 123 F.3d 672 (7th Cir. 1997) ...................................................................57

**STATUTES / REGULATIONS / RULES**                                                    **PAGE**

Fed.R.Civ.P. 56 ...............................................................................................................................2

42 U.S.C. § 2000e-2...............................................................................................55

42 U.S.C. § 2000e-3...........................................................................................65, 69

## <u>INTRODUCTION</u>

After Plaintiff reported sexual harassment, Tyson concluded she was sexually harassed over the course of three days. Tyson may be held liable for the harassment because there is sufficient evidence for a jury to conclude that it failed to exercise reasonable care in responding to the harassment it knew about. A jury could find that despite Tyson's conclusion that Richardson sexually harassed Plaintiff, it forced Plaintiff to continue working with Richardson, it retaliated against witnesses who corroborated Plaintiff's complaint, it retaliated against Plaintiff for making her complaint, it refused to discipline Richardson, and it offered Richardson a transfer to a more favorable, higher paying job while telling Plaintiff her "only" option was to transfer to a less favorable, lower paying job. Ultimately, Tyson rewarded Richardson for sexually harassing Plaintiff by granting his transfer request and giving him a raise in violation of company policy. Finally, after going unchecked for harassing Plaintiff, Richardson proceeded to sexually harass at least one other female employee. Considering these facts, Tyson is not entitled to judgment as a matter of law on Plaintiff's claim of sexual harassment.

Tyson is also not entitled to summary judgment on Plaintiff's claim of retaliation. For some of Plaintiff's retaliation claims, Tyson does not even offer a reasonable explanation for its conduct. Instead, it argues that threats and intimidation do not qualify as retaliation. As stated below, Plaintiff withdraws parts of her retaliation claim. But Tyson is not entitled to summary judgment on Plaintiff's claim that she was retaliated against in the form of intimidation and threats from Clifford immediately following her complaints, issued two write-ups by Clifford on October 26, 2015 for conduct that occurred and was addressed months prior, and issued a write-up on April 29, 2016 under false pretenses. For these actions, there is sufficient evidence and a legal basis for a jury to find they were acts of illegal retaliation. Thus, they should proceed to trial.

**<u>LEGAL STANDARD</u>**

Summary judgment is only proper where there are no disputed material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When deciding a summary judgment motion, the Court must adhere to the "fundamental principle[s]" that govern the analysis. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863; 1868 (U.S. 2014). Failure to do so warrants reversal. *See id.*

To obtain summary judgment, the movant must prove all its material facts are undisputed. *Golleher v. Aerospace Dist. Lodge*, 122 F. Supp.2d 1053, 1056 (8th Cir. 2000). When evaluating the facts, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). All the evidence must be viewed in Plaintiff's favor as the non-moving party. *Tolan*, 134 S.Ct. at 1866. "[T]he evidence of the nonmovant [must] be believed." *Id.* at 1863. Every "justifiable inference" must also be drawn in the nonmovant's favor. *Id.* Conversely, inferences that support Tyson's position are forbidden and must not influence the outcome of its motion. *See id.* at 1866-67 (discussing inferences trial court impermissibly drew in movant's favor).

The Court should be cautious of granting summary judgment based on testimony from interested witnesses. *Reeves*, 530 U.S. at 151. Any evidence favoring Tyson that a jury is not required to believe must be disregarded, such as evidence that is contradicted, impeached, or comes solely from interested witnesses. *See id.* Ultimately, summary judgment must be denied when the evidence and inferences drawn therefrom *could* allow a reasonable jury to return a verdict for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under this framework, Tyson is not entitled to summary judgment. The material facts Tyson relies on are disputed, and Plaintiff's additional facts show a countervailing story, upon which a jury could find Tyson broke the law.

## PLAINTIFF'S RESPONSES TO TYSON'S STATEMENT OF MATERIAL FACTS

1      Plaintiff became employed by The Hillshire Brands Company as a Production Packer at its Kansas City, Kansas facility on or about June 6, 2014. Pretrial Order, §2(a)(1).

**RESPONSE: UNCONTROVERTED.**

2      Tyson purchased The Hillshire Brands Company on August 28, 2014. *Id.* at §2(a)(2).

**RESPONSE: UNCONTROVERTED.**

3      Tyson produces fresh and cooked chicken, beef and pork products in facilities throughout the country. *Id.* at §2(a)(3).

**RESPONSE: UNCONTROVERTED.**

4      Plaintiff is currently employed by Tyson and works at its Kansas City, Kansas facility. Since beginning her employment with The Hillshire Brands Company on or about June 6, 2014, Plaintiff has continued to work as a Production Packer on second shift. *Id.* at §2(a)(4); Deposition of Plaintiff ("Pl. Dep."), attached hereto as Exhibit 1, at 10:6-8, 11:18-22, 12:25-13:4.

**RESPONSE: UNCONTROVERTED.**

5      Plaintiff's job duties include, among other things, performing perfect packaging checks and identifying material quality defects and taking appropriate action. Ex. 1, Pl. Dep. at 15:4-19, 16:23-2.

**RESPONSE: UNCONTROVERTED.**

6      Plaintiff and some other Production Packers have also performed Quality Assurance ("QA") Float duties, which involve running certain quality checks on Tyson's product and then documenting that those checks have been performed. Ex. 1, Pl. Dep. at 10:24-11:5, 45:7-21. These QA Float duties are incorporated into the job responsibilities of the Production Packer position. *Id.* at 19:6-10.

**RESPONSE: UNCONTROVERTED.**

7  Plaintiff acknowledged she was trained on the proper way to handle packaging material verification at shift startup and changeovers, processes relating to the QA float duties, concepts and processes of the changeover audit form, processes of performing net weight checks, and concepts and processes of the housekeeping checklist. Ex. 1, Pl. Dep. at 129:23-130:4, 131:23-132:2, 132:9-14, 133:13-18, 133:24-134:6; Plaintiff's Training Sign-Off Forms (Ex. 13-17 of Pl. Dep.), attached hereto as Exhibit 2. Plaintiff agreed to strictly follow the process and procedures covered in these trainings. Ex. 1, Pl. Dep. at 130:24-131:2, 132:3-8, 133:8-12, 133:19-23, 134:7-10; Ex. 2, Plaintiff's Training Sign-Off Forms.

**RESPONSE: UNCONTROVERTED.**

8  Throughout Plaintiff's employment, the Kansas City, Kansas facility has maintained an employee handbook applicable to all employees at the facility. Deposition of Nina Erickson ("Erickson Dep."), attached hereto as Exhibit 3, at 11:7-15, 11:20-12:1; Deposition of Simone Clifford ("Clifford Dep."), attached hereto as Exhibit 4, at 16:14-22; Employee Handbook (Ex. 1 of Clifford Dep.), attached hereto as Exhibit 5. This handbook includes a policy titled Prevention of Sexual and Other Unlawful Harassment and Discrimination. Ex. 3, Erickson Dep., at 12:2-11; Ex. 5, Employee Handbook at Bates D000282.

**RESPONSE: CONTROVERTED.**

  a. **The Sara Lee Employee Handbook was implemented when the facility was owned and operated by Sara Lee; even Tyson has not replaced the handbook since taking over in August 2014, and the handbook continued to apply to employees who were previously employed by Sara Lee, "most" of the policies in the Sara Lee Employee Handbook have been replaced by Tyson policies.** *See* <u>Exhibit 1</u>, Clifford Depo. 15:12-23; 16:2-8, 14-25; 17:1-20.

  b. **The sexual harassment and discrimination portion of the Sara Lee handbook, referred to by Tyson in this statement of fact, was replaced by a Tyson policy during March 2015.** <u>Ex. 1</u>, 18:3-11.

9  After Tyson purchased The Hillshire Brands Company, it supplemented this handbook policy with its Harassment and Discrimination Policy. Tyson implemented its Harassment and Discrimination Policy at the Kansas City, KS facility in March 2015. Ex. 3, Erickson Dep. at 12:12-17, 13:8-15, 103:24-104:8; Tyson Harassment and Discrimination Policy (Ex. 64 to Erickson Dep.), attached hereto as Exhibit 6.

**RESPONSE: UNCONTROVERTED.**

10  Tyson's Harassment and Discrimination Policy specifically prohibits unlawful harassment and discrimination based on sex, including sexual harassment and hostile work environment harassment. Ex. 6, Tyson Harassment and Discrimination Policy.

**RESPONSE: UNCONTROVERTED.**

11  This Policy further requires any Tyson Team Member who witnesses, experiences, and/or learns about harassment or discrimination to immediately report it. *Id.*

**RESPONSE: UNCONTROVERTED.**

12  Under this Policy, Tyson Team Members have multiple avenues by which to report unlawful harassment and/or discrimination, including the Team Member's:

- Supervisor;
- Plant or Facility Manager;
- General or Production Manager;
- Plant HR Manager;
- Assistant Plant HR Manager;
- Shift HR Manager;
- Complex HR Manager;
- Assistant Complex HR Manager;
- Director HR Operations Manager;
- The Employment Compliance Department (by toll-free number), or
- 24 Hour Tell Tyson First Line (by toll-free number).

*Id.*

**RESPONSE: UNCONTROVERTED.**

13    This Policy provides that, where unlawful harassment is found to have occurred, appropriate disciplinary action will be taken. *Id.* It further provides that, depending on the seriousness of the offense, or repetition of a prior offense, one of the following disciplinary actions will be taken:

- Written Warning for the offending Team Member's personnel file
- Suspend, and file record
- Transfer and/or demotion
- Discharge

*Id.*

**RESPONSE: UNCONTROVERTED.**

14    The Policy also prohibits retaliation against those who report harassment and/or discrimination. *Id.*

**RESPONSE: UNCONTROVERTED.**

15    Plaintiff received training on and a copy of this Policy when Tyson implemented it at the Kansas City, Kansas facility in March 2015. Plaintiff certified that she understood this Policy and agreed to comply with it. Ex. 1, Pl. Dep. at 50:5-24; Training Acknowledgment Form (Ex. 4 to Pl. Dep.), attached hereto as Exhibit 7; Ex. 4, Clifford Dep. at 37:3-16.

**RESPONSE: UNCONTROVERTED.**

16    After implementing its Harassment and Discrimination Policy at its Kansas City, Kansas facility in March 2015, Tyson began providing this Policy to each facility Team Member at the time of hire and covering this Policy during Team Member orientation sessions. Tyson has also provided annual training on this Policy to its Kansas City, Kansas Team Members. Ex. 3, Erickson Dep. at 104:9-23.

**RESPONSE: CONTROVERTED.**

   a. **Tony Richardson accepted employment with Tyson on June 10, 2015 and his first day of work was June 15, 2015. <u>Exhibit 2</u>, Richardson Depo. 7:14 – 8:2; 10:13-15.**

b. **Tyson's Harassment/Discrimination Policy was not provided to Richardson until September 14, 2015. <u>Ex. 2</u>, 51:8-18; <u>Exhibit 3</u>, Training Acknowledgment Form signed by Richardson (Richardson Depo. Exhibit 58).**

c. **September 14, 2015 was the same day Clifford issued Richardson a write-up for "causing discomfort amongst a few female employees" by "issuing vulgar photographs to another team member." <u>Ex. 1</u>, Clifford Depo. 93:8-23; <u>Exhibit 4</u>, Corrective Action Form (Clifford Depo. Exhibit 21).**

d. **When Richardson was hired, he signed a form acknowledging he received a copy of the "Hillshire Brands" policy, but he testified that he does not remember receiving paper copies of any policy upon being hired, he only remembers watching videos. <u>Ex. 2</u>, 10:7-12; 16-25; 11:1-5; <u>Exhibit 5</u>, Richardson's Orientation Training Packet (Richardson Depo. Exhibit 54).**

17    Tyson Team Member Anthony Richardson received training on and a copy of this Policy when he was hired at the Kansas City, Kansas facility in June 2015. Deposition of Anthony Richardson ("Richardson Dep."), attached hereto as Exhibit 8, at 72:3-19.

**RESPONSE: CONTROVERTED.**

a. **Tyson has produced no document showing Richardson received the Tyson policy prior to September 14, 2015.**

b. **Tyson's Harassment/Discrimination Policy provided to Richardson on September 14, 2015. Ex. 2, 51:8-18; <u>Exhibit 3</u>, Training Acknowledgment Form signed by Richardson (Richardson Depo. Exhibit 58).**

c. **When Richardson was hired, he signed a form acknowledging he received a copy of the "Hillshire Brands" policy, but he testified that he does not remember receiving paper copies of any policy upon being hired, he only remembers watching videos. Ex. 2, 10:7-12; 16-25; 11:1-5; <u>Exhibit 5</u>, Richardson's Orientation Training Packet (Richardson Depo. Exhibit 54).**

18    On September 9, 2015, Mr. Richardson began training on Plaintiff's line, at which time Plaintiff alleges that he began subjecting her to sexually harassing conduct over the course of their shifts together on September 9, 10 and 11, 2015. [1] Ex. 1, Pl. Dep. at 57:9-11; Plaintiff's Statement (Ex. 5 to Pl. Dep.), attached hereto as Exhibit 9.

---

[1] Plaintiff did not have any interactions or problems with Mr. Richardson prior to September 9, 2015. Ex. 1, Pl. Dep. at 57:12-58:1. **RESPONSE: UNCONTROVERTED.**

**RESPONSE: UNCONTROVERTED.**

19      Mr. Richardson is an hourly co-worker who had no supervisory or managerial authority over Plaintiff. Ex. 1, Pl. Dep. at 58:6-14.

**RESPONSE: UNCONTROVERTED.**

20      Plaintiff claims that Mr. Richardson subjected her to the following conduct on September 9, 2015:

- He asked if she had a boyfriend and, when Plaintiff responded that she was getting married, Mr. Richardson said three times that Plaintiff's boyfriend was lucky.
- He asked if she was looking for a stripper and Plaintiff said no. He told Plaintiff that he strips in St. Louis.
- He made a noise saying "dang, Tonia, come here." Plaintiff asked what he wanted and Mr. Richardson said "when you touched me." Plaintiff said "when did I touch you," to which Mr. Richardson responded "when you moved me out of your way, that felt good. My wife's never touched me like that."
- He bumped up against Plaintiff, reached over her and kind of rubbed on the side of her breast.[2]

Ex. 1, Pl. Dep. at 58:20-61:10; Ex. 9, Plaintiff's Statement.

**RESPONSE: UNCONTROVERTED.**

---

[2] Plaintiff did not include this allegation in her written statement, and does not know why she did not do so. Ex. 1, Pl. Dep. at 61:11-20.

**RESPONSE: UNCONTROVERTED that Plaintiff did not include this allegation in the September 12, 2015 written statement she prepared. However, Plaintiff reported this and other instances of being touched by Richardson to her supervisors.**

   a. **On September 9, 2012 Plaintiff told Team Lead Stallings that Richardson was "rubbing on the side of [her] breast." <u>Ex. 6</u>, 62:17 – 63:14.**

   b. **On September 12, 2015 Plaintiff spoke with a Value Stream Manager Nathan Pease. SOF ¶35. According to Pease's record of the conversation, Plaintiff reported that Richardson "keeps touching her shoulder." <u>Exhibit 13</u>, Pease Statement (Clifford Depo. Exhibit 6); Doc. 41, Pretrial Order at 4, ¶(b)(3).**

   c. **On September 12, 2015 Plaintiff also told Pease that Richardson "walks up behind her and talks really close to her." <u>Ex. 13</u> (page marked D000019).**

21      On September 9, 2015, Plaintiff talked with Team Lead Dejuana Stallings about Mr. Richardson's conduct, but did not ask Ms. Stallings to do anything about it. Ex. 1, Pl. Dep. at 62:17-63:19.

**RESPONSE: UNCONTROVERTED.**

22      Ms. Stallings and other Team Leads at Tyson's Kansas City, Kansas facility are hourly employees who assist supervisors with running the production line. Ex. 3, Erickson Dep. at 56:3-13. Like Plaintiff, these Team Leads perform the Production Packer role. Ex. 1, Pl. Dep. at 22:17-19.

**RESPONSE: UNCONTROVERTED.**

23      The Team Leads are not Plaintiff's supervisors and do not have any authority to discipline Plaintiff. *Id.* at 23:10-12, 24:15-18. The Team Leads had no authority to hire, fire, or discipline employees. Ex. 3, Erickson Dep. at 105:1-16.

**RESPONSE: UNCONTROVERTED that Team Leads did not have authority to hire or fire Plaintiff.**

**CONTROVERTED that Team Leads were not Plaintiff's supervisors at work.**

   a. **As Plaintiff testified, Team Leads are "basically our supervisors. We report to them for everything." <u>Exhibit 6</u>, Plaintiff Depo., 22:5-13.**

   b. **Plaintiff's Team Leads would tell Plaintiff where to work, were the point of contact if a machine has technical problems, the Team Leads know the schedule for the shift, the Team Leads are who team members such as Plaintiff are to go to if they are having problems with other co-workers, the Team Leads handle paperwork, and can recommend discipline, Team Leads can coach team members and change team members' roles during the shift. <u>Ex. 6</u>, 23:13- 24:6.**

24      While Tyson supervisors have heightened responsibilities under Tyson's Harassment and Discrimination Policy, the Team Leads have no greater responsibility than any other hourly Tyson Team Member to report harassment. Ex. 3, Erickson Dep. at 105:17-106:20.

**RESPONSE: CONTROVERTED.**

a. Erickson testified on behalf of Tyson as its Rule 30(b)(6) representative for certain topics, but the job descriptions of the positions of Team Lead and Supervisor were not among those topics. Ex.7, 9:3-23; Exhibit 9, Amended Notice to Take Videotaped Deposition of Tyson Foods, Inc. (Erickson Depo. Exhibit 63).

b. Tyson has not set forth any evidence that Erickson has personal knowledge of the job duties or responsibilities of the Team Lead position at the Tyson facility in Kansas City, Kansas, rendering her testimony on this topic inadmissible. *See* FRE 602.

    i. Erickson is the HR Manager for a Tyson plant in Zeeland, Michigan. Ex.7, 4:5-8; 4:19-21; 6:4-5; 6:12-14.

    ii. The job title "Team Lead" does not exist at the plant where Erickson works. Ex. 7, 95:5-9.

c. Erickson did testify on behalf of Tyson regarding the "contents, application, and use of … Tyson Foods, Inc.'s EEO, harassment, and retaliation policies." Ex. 9, ¶1(a).

d. Tyson's Harassment/Discrimination Policy does not set forth any "heightened responsibilities" for supervisors. *See* Exhibit 8, Tyson Harassment/Discrimination Policy (Erickson Depo. Ex. 64).

e. Wherever the phrase "Team Member" is used in Tyson policies, including the Harassment/Discrimination Policy, that phrase includes ALL employees, hourly and management. Ex. 7, 13:19 – 14:14.

f. Every employee, including Team Leads, has an obligation to report harassment they become aware of, even if it is not directed at them. Ex. 7, 18:3-11.

25    Plaintiff claims that Mr. Richardson subjected her to the following conduct on September 10, 2015:

- He asked what Plaintiff thought about what he said about stripping; Plaintiff said she wasn't interested and did not want any part of that.
- He told Plaintiff that he gave co-worker Kim Cobb some pictures to give to Plaintiff and that another co-worker could see them but he did not want a supervisor to see them.
- He told Plaintiff that she was "probably not ready for these pictures."

Ex. 1, Pl. Dep. at 64:8-65:17, 70:7-11; Ex. 9, Plaintiff's Statement.

**RESPONSE: CONTROVERTED. Plaintiff did testify Richardson engaged in this conduct toward her on September 10, 2015, but SOF ¶25 is not an exhaustive list.**

a. Richardson was also "yelling and screaming across the whole building" to Plaintiff every time she would be speaking to a different male employee, saying that he needed

**help, but when she went to assist him, he had nothing to ask or say.  Ex. 6, 69:17 – 70:6.**

b. **Richardson also kept "touching her shoulder." Ex.13.**

c. **Richardson would also "walk[ ] up behind her and talk[ ] really close to her." Ex.13.**

26      On September 10, 2015, Plaintiff advised Ms. Stallings that Mr. Richardson was doing the same thing he did the day before and mentioned something about some pictures. Ex. 1, Pl. Dep. at 65:18-66:15; Ex. 9, Plaintiff's Statement.

**RESPONSE: UNCONTROVERTED.**

27      In response, Ms. Stallings told Plaintiff she would talk with another Team Lead, Jun Penn, who then came to speak with Plaintiff and asked her what happened. Ex. 1, Pl. Dep. at 66:2-14, 67:14-18; Ex. 9, Plaintiff's Statement.

**RESPONSE: UNCONTROVERTED.**

28      Mr. Penn offered to talk with Mr. Richardson, but Plaintiff asked Mr. Penn not to talk with Mr. Richardson because maybe Mr. Richardson got the hint. Ex. 1, Pl. Dep. at 67:19-25; Ex. 9, Plaintiff's Statement.

**RESPONSE: UNCONTROVERTED.**

29      Plaintiff did not go "upstairs" to report Mr. Richardson's alleged harassment that day because she did not want him to lose his job and wanted to give him a chance to back off before reporting his conduct. Ex. 1, Pl. Dep. at 68:13-69:16; Ex. 9, Plaintiff's Statement.

**RESPONSE: CONTROVERTED that this was the full explanation given by Plaintiff.**

a. **Plaintiff testified she also did not "go upstairs" to report Richardson at first because, based on her experience working in factory settings, when male employees would make such comments to her and she told them she did not like it, or stopped talking to them, they usually stopped. Ex.6, 68:20 - 69:16.**

30      Plaintiff claims that Mr. Richardson subjected her to the following conduct on September 11, 2015:

- He made comments about Plaintiff talking with a male co-worker, said Plaintiff reminded him of his wife, that he and his wife worked together and she would talk and laugh with other men but not with him, and that's how Plaintiff was acting.
- He said if he was her husband he would be upset.
- He followed her around making "huh "huh" noises every time Plaintiff would talk with a male co-worker.
- He said she looked good outside her work clothes.
- He sent her a Facebook friend request at 2:30 a.m.

Ex. 1, Pl. Dep. at 70:12-71:23, 72:6-11; Ex. 9, Plaintiff's Statement.

**RESPONSE: UNCONTROVERTED that Richardson subjected Plaintiff to the conduct listed, but to the extent Tyson claims its list is exhaustive this Fact is CONTROVERTED.**

a. **Toward the end of the shift on September 11, 2015, Richardson grabbed Plaintiff's arm, and said, "Let's go, let's go, we have to leave." This made Plaintiff afraid to walk outside so she waited in the locker room until the other women she worked with were ready to leave. Ex. 6, 73:13-18; 74:1-8.**

31      While in the locker room after Plaintiff's shift on September 11, 2015, Ms. Cobb

showed Plaintiff and other hourly Team Members nude photographs that Mr. Richardson had sent

to Ms. Cobb. Ex. 1, Pl. Dep. at 73:13-75:19.

**RESPONSE: UNCONTROVERTED that Cobb showed naked pictures of Richardson to Plaintiff and other female employees in the locker room after the shift.**

**To the extent Tyson claims that was the extent of Cobb's inappropriate conduct toward Plaintiff, this fact is CONTROVERTED. Cobb also made offensive comments to Plaintiff.**

a. **Cobb told Plaintiff, referring to Richardson, "Tony just wants to strip for you, he wants to show you these" and "he has some pictures for you." Ex. 6, 73:13-23.**

b. **Plaintiff told Cobb that she did not want to hear about Richardson, his offer to strip for Plaintiff, or the pictures, but Cobb "kept trying to tell [Plaintiff] about it." Ex. 6, 73:12-25.**

c. **Cobb then showed Plaintiff pictures of Richardson that showed Richardson's penis. Ex. 6, 74:14 – 75:7; 75:16-17.**

d. **Plaintiff felt like Cobb wanted Plaintiff to accept the way Richardson was treating her. Ex. 6, 123:13-15.**

e. **Cobb later became upset with Plaintiff for reporting Richardson's conduct and the pictures. Ex. 6, 123:5-9.**

32      Plaintiff did not report Mr. Richardson's alleged sexually harassing conduct to any

Tyson supervisor until Saturday, September 12, 2015, when she made a report to supervisor

Marcus Alexander. Ex. 1, Pl. Dep. at 87:10-24.

**RESPONSE: UNCONTROVERTED that Plaintiff did not previously report Richardson's conduct to someone with the job title "supervisor."**

**CONTROVERTED that Plaintiff did not report Richardson to employees who supervised her at work prior to September 12, 2015.**

a. **On September 9, 2015 Plaintiff reported Richardson's conduct from that day to Dejuana Stallings. Ex. 6, 62:17-22.**

b. **On September 9, 2015, Plaintiff told Dejuana Stallings about Richardson's comments, and that "he was bumping up against [her] and rubbing on the side of [her] breast." Ex. 6, 63:2-14.**

c. **Dejuana Stallings was a Team Lead. Ex. 6, 22:23 – 23:1.**

d. **Plaintiff reported Richardson to Team Lead Stallings again on September 10, 2015, and in response, Stallings told Plaintiff she would forward her concerns to someone else. Ex. 6, 64:8 – 65:21.**

e. **On September 10, 2015, Plaintiff told Stallings that Richardson was continuing to make comments and he mentioned the pictures. Ex. 6, 66:2-9.**

f. **Plaintiff also reported Richardson's conduct to June Penn on September 10, 2015. Ex. 6, 67:14-18.**

g. **June Penn was also a Team Lead at that time. Ex. 1, 65:21 – 66:2.**

h. **Team Leads are "basically [Plaintiff's] supervisors. [Sh]e report[s] to them for everything." Ex. 6, 22:5-13.**

i. **Plaintiff's Team Leads tell her where to work, were the point of contact if a machine has technical problems, the Team Leads know the schedule for the shift, the Team Leads are who team members such as Plaintiff go to if they are having problems with other co-workers, the Team Leads handle paperwork, can recommend discipline, can coach team members, and change team members' roles during the shift. Ex. 6, 23:13-24:6.**

j. **On September 12, 2015, prior to speaking with Supervisor Marcus Alexander, Plaintiff reported the pictures, the Facebook request, and Richardson's conduct throughout the three days prior to two Team Leads: Dejuana Stallings and Alejandra Cooper. Ex. 6, 22:23 – 23:1; 34:17-20; 77:19 – 78:5.**

33    Tyson maintains an Ethics Advantage file that reflects actions it took in response to Plaintiff's report about Mr. Richardson and contains information gathered during its investigation into this report. Ex. 3, Erickson Dep. at 106:21-107:20. This file includes a five page report that accurately summarizes actions Tyson took in response to Plaintiff's report. *Id.*; Ethics Advantage File Summary (Ex. 73 to Erickson Dep.), attached hereto as Exhibit 10, at Bates D000846-850.

**RESPONSE: CONTROVERTED. The Ethics Advantage report includes actions Tyson took more than one month after it completed its investigation, which suggests such actions were not taken "in response to Plaintiff's report."**

a.   **Simone Clifford, HR Manager of Tyson's facility in Kansas City, Kansas, conducted the investigation into Plaintiff's initial sexual harassment complaints against Richardson and Cobb. Ex. 1, 6:16-17; 9:2-5; 9:18-25; 35:22 – 36:2.**

b.   **Clifford received notice of Plaintiff's complaints against Richardson and Cobb on Saturday, September 12, 2015, and filled out a form called the "Investigation Opening Summary" at that time. Ex. 1, 35:4-13; 35:22 – 36:2; 36:22 – 37:2; Exhibit 10, Investigation Opening Summary Form (Clifford Depo. Exhibit 4).**

c.   **When Clifford completed her investigation, she filled out a form called the "Investigation Closing Summary." Ex. 1, 41:14-25; Exhibit 11, Investigation Closing Summary (Clifford Depo. Exhibit 5).**

d.   **Clifford completed and closed her investigation into Plaintiff's complaints against Cobb and Richardson on September 25, 2015. Ex. 1, 42:1-8; *see also* Ex. 11 (showing "today's date" as 9/25/15).**

e.   **On October 29, 2015 Clifford was issued written discipline for not creating an Ethics Advantage case report during her September 2015 investigation. Ex. 1, 69:1-12; Exhibit 12, Written Warning (Depo. Exhibit 15); Ex. 7, 71:17-23; 72:13-15.**

f.   **Erickson, whose testimony is cited by Tyson to support its assertion that the summary in the Ethics Advantage report is accurate, did not know there was an investigation occurring during September. Ex. 7, 46:2-6.**

g.   **The Ethics Advantage Report was not opened until October 27, 2015. Ex. 1, 178:14-18; 179:1-9.**

h.   **The Ethics Advantage Report includes actions that were not taken during Clifford's September 2015 investigation, such as the Written Warning issued to Clifford (*see Defendant's Exhibit 10¸page marked D000847), which was issued on October 29, 2015, see* SOF ¶33(e).**

i. **October 29, 2015 was 34 days after Clifford already concluded her investigation into Plaintiff's complaints.** *See* **SOF ¶33(d).**

34      Upon receipt of Plaintiff's report against Mr. Richardson, Mr. Alexander alerted Value Stream Manager Nathan Pease, who called the facility's Human Resources Manager, Simone Clifford, at home and advised her of Plaintiff's report. Ex. 1, Pl. Dep. at 90:2-17, 96:14-22; Ex. 4, Clifford Dep. at 32:18-33:22; 36:22-37:2.

**RESPONSE: UNCONTROVERTED.**

35      Mr. Pease interviewed Plaintiff and obtained from Plaintiff a written statement of Mr. Richardson's alleged harassing conduct. Ex. 4, Clifford Dep. at 34:1-7; Record of Plaintiff's Interview (Ex. 6 to Clifford Dep.), attached hereto as Exhibit 11; Ex. 1, Pl. Dep. at 53:19-54:7, 92:6-93:9;  Ex. 9, Plaintiff's Statement.

 **RESPONSE: UNCONTROVERTED.**

36      The purpose of Plaintiff writing this statement was to explain to Tyson her report of sexual harassment by Mr. Richardson. Ex. 1, Pl. Dep. at 54:8-13. At the time Plaintiff wrote this statement, she believed it was important to give an accurate, thorough and complete description of the harassment she claims to have experienced by Mr. Richardson. *Id.* at 54:14-25. Plaintiff's written statement contains an accurate description of the alleged harassment she experienced by Mr. Richardson. *Id.* at 55:1-5.

**RESPONSE: UNCONTROVERTED.**

37      Pursuant to Ms. Clifford's guidance, Tyson management obtained a written statement from Mr. Richardson and suspended him for the day without pay pending further investigation. Ex. 10, Ethics Advantage File Summary at Bates D000849; Ex. 4, Clifford Dep. at 34:1-7; Richardson Statement (Ex. 8 to Clifford Dep.), attached hereto as Exhibit 12; Ex. 8, Richardson Dep. at 73:5-74:3.

**RESPONSE: UNCONTROVERTED.**

38      Tyson management also obtained written statements from Ms. Stallings, Mr. Penn,

and the Team Members on duty who viewed the pictures of Mr. Richardson in the locker room.

Ex. 10, Ethics Advantage File Summary at Bates D000849; Ex. 4, Clifford Dep. at 34:13-35-3;

Team Member Statements (Ex. 9, 10, 12, 14 and 16 to Clifford Dep.), attached hereto as Exhibit

13.

**RESPONSE: UNCONTROVERTED.**

39      Prior to Plaintiff's complaint about Mr. Richardson, Tyson had not received any

complaints against Mr. Richardson and had not issued him any discipline. Ex. 4, Clifford Dep. at

40:4-12, 100:24-101:2.

**RESPONSE: UNCONTROVERTED that Plaintiff was the first person to report Richardson
for sexual harassment. However, it is unclear which "complaint" Tyson is referring to when
it uses the phrase, "Plaintiff's complaint about Mr. Richardson."**

    **a.  Plaintiff complained about Richardson to Team Lead Stallings on September 9, 2015.
Ex. 6, 62:17-22.**

    **b.  Plaintiff complained about Richardson to Team Lead Stallings on September 10,
2015. Ex. 6, 66:2-9.**

    **c.  Plaintiff complained about Richardson to two Team Leads on September 12, 2015:
Stallings and Cooper. Ex. 6, 22:23 – 23:1; 34:17-20; 77:19 – 78:5**

    **d.  Finally, Plaintiff complained about Richardson to Supervisor Marcus Alexander on
September 12, 2015. *See* SOF ¶32.**

40      Based on Ms. Clifford's review of the statements obtained on Saturday, September

12, 2015, she determined that Plaintiff's complaint was substantiated and that she had sufficient

information to take action against Mr. Richardson. Ex. 4, Clifford Dep. at 122:16-123:12, 180:14-

16.

**RESPONSE: UNCONTROVERTED.**

41    Thus, when Mr. Richardson returned to work on September 14, 2015, Ms. Clifford

issued Mr. Richardson a Level 3 Final Warning with a one-day suspension. Ex. 4, Clifford Dep.

at 93:9-16; Richardson Final Warning (Ex. 21 to Clifford Dep.), attached hereto as Exhibit 14; Ex.

8, Richardson Dep. at 74:23-76:21. Mr. Richardson was issued this Level 3 Final Warning based

on the severity of his conduct. Ex. 4, Clifford Dep. at 97:5-8.

**RESPONSE: UNCONTROVERTED that Richardson received a Level 3 Warning on September 14, 2015.**

**However, to the extent Tyson claims Richardson was disciplined for his interactions with Plaintiff, this fact is CONTROVERTED.**

   a.  **The Level 3 Written warning issued to Richardson only refers to Richardson sharing vulgar photographs with a co-worker outside of work; it makes no reference of him making comments to Plaintiff or touching Plaintiff. Exhibit 14, Hourly Corrective Action form (Clifford Depo. Exhibit 21).**

   b.  **The only conduct of Richardson that is specifically referenced on the write-up form is Richardson giving the photographs to Kim Cobb. Ex. 14; Ex. 2, 39:2-8; 41:3-6.**

   c.  **Richardson thinks he received the write-up for giving naked pictures of himself to female co-worker Kim Cobb. Ex. 2, 39:2-8; 39:15 – 40:2.**

   d.  **When Clifford issued Richardson the write-up, she talked about Cobb and the pictures; Richardson cannot recall any conversation about Plaintiff or his interactions with Plaintiff in relation to the write-up. Ex. 2, 41:7-15.**

   e.  **Richardson does not know the write-up was supposedly for the way he spoke to Plaintiff. Ex. 2, 41:12-15.**

   f.  **The Level 3 write-up issued to Richardson makes no reference to Richardson making inappropriate comments to Plaintiff or touching Plaintiff. Exhibit 14.**

   g.  **Richardson does not think he ever received a write-up for the way he interacted with Plaintiff. Ex. 2, 55:9-19.**

42    Ms. Clifford also reviewed with Mr. Richardson Tyson's Harassment and

Discrimination Policy, told him to avoid all contact with Plaintiff, and advised that he would be

temporarily moved to a different area of Plaintiff's department pending permanent reassignment

to a different department. Ex. 8, Richardson Dep. at 72:3-11, 75:7-11; Richardson Training Acknowledgment Form (Ex. 58 to Richardson Dep.), attached hereto as Exhibit 15.

**RESPONSE: UNCONTROVERTED that Clifford gave Richardson the Harassment and Discrimination Policy when they met.**

**CONTROVERTED that there was any discussion about Plaintiff at that time.**

    a. **Richardson cannot recall any conversation about Plaintiff related to the write-up, he only remembers Clifford talking about him giving Kim Cobb the naked pictures of himself. <u>Ex. 2</u>, 41:7-15.**

    b. **Richardson does not know the write-up was supposedly issued to him for the way he spoke to Plaintiff. <u>Ex. 2</u>, 41:12-15.**

    c. **The Level 3 write-up issued to Richardson makes no reference to Richardson making inappropriate comments to Plaintiff or touching Plaintiff. <u>Exhibit 14.</u>**

    d. **The only conduct of Richardson that is specifically referenced on the write-up form is Richardson giving the photographs to Kim Cobb. <u>Ex. 14</u>; <u>Ex. 2</u>, 39:2-8; 41:3-6.**

    e. **Richardson thinks he received the write-up for giving naked pictures of himself to female co-worker Kim Cobb. <u>Ex. 2</u>, 39:2-8; 39:15 – 40:2.**

    f. **Richardson does not know the write-up was allegedly for the way he spoke to Plaintiff. <u>Ex. 2</u>, 41:12-15**

    g. **Richardson does not think he ever received a write-up for the way he interacted with Plaintiff. <u>Ex. 2</u>, 55:9-19.**

**It is also CONTROVERTED that Richardson was told he was being "<u>temporarily</u> moved to a different area … <u>pending permanent reassignment</u> to a different department." (emphasis added).**

    h. **Richardson was not told why he was moved to the mezzanine. <u>Ex. 2</u>, 61:7-19; 62:2-8.**

    i. **Richardson was never told he was moved to the mezzanine as a form of punishment for the way he spoke to and interacted with Plaintiff; Richardson does not think his transfer to the warehouse was related to Plaintiff or her complaints against him. <u>Ex.2</u>, 26:3-11; 27:5-11; 62:16-19.**

    j. **The request to have Richardson permanently moved was not made until October 5, 2015. <u>Ex. 1</u>, 116:1 – 117:13; <u>Exhibit 21</u>, Richardson's Internal Transfer Request (Clifford Exhibit 26).**

    k. **Richardson transferred to the Warehouse because he requested it. <u>Ex. 2</u>, 61:20 – 62:1; 63:1-6.**

      **l.** **Richardson believes the sole reason he was transferred to the warehouse was because he requested it so he could get a raise. Ex. 2, 24:24 – 25:1; 25:11-21; 26:9-11.**

43      Mr. Richardson's Level 3 Final Warning states that he would be reassigned permanently to another department. Ex. 14, Richardson Final Warning; Ex. 8, Richardson Dep. at 77:7-10.

**RESPONSE: UNCONTROVERTED.**

44      Mr. Richardson was temporarily moved to a different area of Plaintiff's department, the mezzanine, which is on a different level than where Plaintiff worked. Ex. 4, Clifford Dep. at 137:24-138:8; Ex. 8, Richardson Dep. at 78:16-79:4; Ex. 3, Erickson Dep. at 64:11-23; Ex. 10, Ethics Advantage File Summary at Bates D000849.

**RESPONSE: UNCONTROVERTED.**

45      Mr. Richardson understood that his move to the mezzanine was a temporary move pending his permanent transfer to another department. Ex. 8, Richardson Dep. at 77:24-78:21.

**RESPONSE: CONTROVERTED that Richardson's "move to the mezzanine was temporary … pending his permanent transfer to another department."**

**Tyson's description of Richardson's understanding is also CONTROVERTED.**

      **a.** **Richardson was not given a reason for why he was being moved to the mezzanine. Ex. 2, 61:7-19; 62:2-8.**

      **b.** **Richardson was never told he was being moved to the mezzanine as a form of punishment for the way he interacted with Plaintiff, or that it was related to Plaintiff's complaints against him. Ex.2, 26:3-11; 27:5-11; 62:16-19.**

      **c.** **The request to have Richardson permanently moved was not made until October 5, 2015. Ex. 1, 116:1 – 117:13; Exhibit 21, Richardson's Internal Transfer Request (Clifford Exhibit 26).**

      **d.** **Richardson transferred to the Warehouse because he requested it. Ex. 2, 61:20 – 62:1; 63:1-6.**

      **e.** **Richardson believes the sole reason he was transferred to the warehouse was because he requested it so he could get a raise. Ex. 2, 24:24 – 25:1; 25:11-21; 26:9-11.**

46      Ms. Clifford subsequently issued Ms. Cobb a Level 1 Documented Reminder for showing the inappropriate photographs of Mr. Richardson to other Team Members and reviewed Tyson's Harassment and Discrimination Policy with her. Ex. 4, Clifford Dep. at 82:14-23; Cobb Level 1 Documented Reminder (Ex. 18 to Clifford Dep.), attached hereto as Exhibit 16; Ex. 10, Ethics Advantage File Summary at Bates D000850.

**RESPONSE: UNCONTROVERTED.**

47      On or about September 14, 2015, Ms. Clifford spoke with Plaintiff and advised that she was following up on Plaintiff's complaint. Ex. 1, Pl. Dep. at 108:11-16, 109:13-16.

**RESPONSE: CONTROVERTED. Clifford spoke with Plaintiff on that day to threaten her with discipline for reporting the situation with Richardson's naked pictures.**

      **a.  When Clifford issued Richardson the Level-3 write-up on September 14, 2015, Richardson told Clifford he felt like the "victim." <u>Ex. 2</u>, 40:14-19.**

      **b.  Richardson told Clifford he was the "victim" because he gave the naked pictures to Cobb, but claimed he told her not to show them at work. <u>Ex.2</u>, 43:23 – 44:2.**

      **c.  Clifford was sympathetic to Richardson's comment that he was the "victim." <u>Ex. 2</u>, 40:20-21.**

      **d.  Clifford then told Plaintiff she should issue Plaintiff a write-up or fire her because of her complaint against Richardson. <u>Ex. 6</u>, 108:4-21.**

      **e.  Clifford told Plaintiff, "Because now Tony [Richardson] is the victim. If it wasn't for you telling anyone, he wouldn't be the victim, but because of you, everyone's running around calling him Mr. Nasty Man." <u>Ex. 6</u>, 108:21-25.**

48      Plaintiff claims that, during this conversation, Ms. Clifford spoke to Plaintiff in an intimidating, threatening manner, accusing Plaintiff of victimizing Mr. Richardson for reporting her concerns to her Team Leads and to two supervisors. First Am. Compl. at ¶50; Ex. 1, Pl. Dep. at 108:4-109:7.

**RESPONSE: UNCONTROVERTED.**

49      Plaintiff further claims that Ms. Clifford threatened to write-up Plaintiff. First Am. Compl. at ¶50; Ex. 1, Pl. Dep. at 108:4-109:2.

**RESPONSE: UNCONTROVERTED.**

50    Plaintiff does not know of any write-up or discipline she received in connection with her report against Mr. Richardson. Ex. 1, Pl. Dep. at 111:10-13. Plaintiff was never written up for making Mr. Richardson a victim. Ex. 1, Pl. Dep. at 118:3-6.

**RESPONSE: UNCONTROVERTED.**

51    On September 25, 2015, Plaintiff reported to Ms. Clifford for the first time that Mr. Richardson was staring at her in team huddles. Ex. 1, Pl. Dep. at 115:16-116:7, 116:19-21. Plaintiff made this report to Ms. Clifford by text message. Text Message (Ex. 25 to Clifford Dep.), attached hereto as Exhibit 17; Ex. 4, Clifford Dep. at 135:24-136:9.

**RESPONSE: UNCONTROVERTED.**

52    In response, Ms. Clifford spoke with Alyssa Rollo, who Plaintiff identified as having seen Mr. Richardson staring at her. Ex. 4, Clifford Dep. at 109:4-25, 136:10-18.

**RESPONSE: CONTROVERTED. Clifford's testimony is contradicted by her failure to document her alleged conversation with Rollo, and by her agreeing to a written statement wherein Tyson claimed Plaintiff never provided any names to Clifford for people who witnessed the staring.**

   a. **Clifford testified that documenting her investigations was very important so she could make a record and refer to it later. <u>Ex. 1</u>, 22:25 – 23:14.**

   b. **Clifford admits she has no documentation showing she followed-up with Rollo as part of an investigation into Plaintiff's complaint that Richardson was staring at her in an intimidating manner at the daily huddles. <u>Ex. 1</u>, 109:4-19; 136:10-24.**

   c. **After Plaintiff filed her Charge of Discrimination with the EEOC, Tyson submitted a statement of its position to the EEOC. Before it was submitted, a draft copy was sent to Clifford for her to review. <u>Ex. 1</u>, 132:2-15; <u>Exhibit 15</u> (Depo. Exhibit 29).**

   d. **The person who wrote the draft was not personally involved in the situation; all the information used to write the draft was provided to the author by Clifford. <u>Ex. 1</u>, 133:6-13.**

   e. **Clifford did not have any edits; she agreed with the draft. <u>Ex. 1</u>, 132:25 – 133:5.**

   f. **The draft Clifford agreed with states:**

When Ms. Thompson indicated that team members told her that Mr. Richardson was starting at her, Ms. Clifford requested the names of those team members or suggested that they come to her directly to provide that information. Contrary to what Ms. Thompson claims in her charge *she did not provide names of any team members* ….

**Exhibit 15**, page marked D000646 (emphasis added).

53    Ms. Clifford also finalized arrangements to permanently transfer Mr. Richardson to the warehouse — a different department in another area of the facility. Ex. 4, Clifford Dep. at 110:17-111:5; Ex. 8, Richardson Dep. at 68:13-16, 79:5-8. Mr. Richardson began training on first shift in that position beginning on September 26, 2015 and was permanently transferred on or about October 3, 2015. [3] Ex. 4, Clifford Dep. at 115:7-13, 119:11-15; Ex. 3, Erickson Dep. at 64:24-25, 65:15-66:12; Ex. 10, Ethics Advantage File Summary at Bates D000849-850.

**RESPONSE: CONTROVERTED.**

a. **On September 9, 2015, Richardson transferred to Plaintiff's department and began working with Plaintiff. Doc. 41,** *Pretrial Order***, ¶(3)(b).**

b. **When Richardson transferred to Plaintiff's department, he did not know his pay was reduced to $16.65 until more than one week after he started working with Plaintiff. Ex. 2, 21:14 – 22:5; 23:14-16.**

c. **When Richardson found out his pay had been reduced, he spoke with HR Manager Clifford to complain about his pay reduction. Ex. 2, 23:6-13.**

d. **HR Manager Clifford then told Richardson if he requested a transfer to the warehouse, he would make $17.50 per hour; so that it what he did. Ex. 2, 23:6-13; 23:17-25; 61:20 - 62:1.**

e. **Richardson transferred to the Warehouse because he requested the transfer so he could get a raise. Ex. 2, 61:20 – 62:1; 63:1-6.**

f. **Richardson received a raise for transferring to the warehouse. Ex. 2, 24:21-23.**

g. **Richardson believes the sole reason he was being transferred to the warehouse was because he requested it so he could get a raise. Ex. 2, 24:24 – 25:1; 25:11-21; 26:9-11.**

_____

[3] Mr. Richardson remained on first shift in the warehouse until May 2016, at which time he began working second shift in the warehouse. Ex. 8, Richardson Dep. at 65:1-11, 65:21-25, 79:9-15. **RESPONSE: UNCONTROVERTED.**

h.  Richardson was never told he was being transferred to the warehouse as a form of punishment, or that it was related to Plaintiff's complaints against him. <u>Ex. 2</u>, 26:3-11; 27:5-11; 62:16 - 63:3.

54    Tyson subsequently conducted a facility-wide re-training on its Harassment and Discrimination Policy at the Kansas City, Kansas facility. Ex. 1, Pl. Dep. at 128:5-18; Ex. 10, Ethics Advantage File Summary at Bates D000849-850.

**RESPONSE: UNCONTROVERTED.**

55    The sexually harassing conduct Mr. Richardson engaged in toward Plaintiff was limited to his conduct on September 9, 10, and 11, 2015. Ex. 1, Pl. Dep. at 88:7-12.

**RESPONSE: UNCONTROVERTED.**

56    As of the time Plaintiff reported Mr. Richardson's conduct to a supervisor on September 12, 2015, Mr. Richardson stopped sexually harassing Plaintiff. Ex. 1, Pl. Dep. at 105:17-21.

**RESPONSE: UNCONTROVERTED that Richardson did not sexually harass Plaintiff between September 12, 2015 and the date of her deposition, which was March 27, 2017.**

**It is CONTROVERTED that the first time Plaintiff reported Richardson to a supervisor at work was September 12, 2015.** *See* **SOF ¶32(a) – (j).**

57    The employee handbook applicable to Team Members at Tyson's Kansas City, Kansas facility includes a Progressive Corrective Action policy. Pursuant to this Policy, progressive corrective action may involve up to five levels: verbal reminder, Level One Documented Reminder (to remain active for three months), Level Two Written Reminder (to remain active for six months), Level Three Final Warning (to remain active for nine months) and Termination of Employment. Ex. 3, Erickson Dep. at 23:7-23, 24:16-21; Progressive Corrective Action Policy (Ex. 2 to Clifford Dep.), attached hereto as Exhibit 18, at Bates D000305-306.

**RESPONSE: UNCONTROVERTED.**

58     Under this policy, aggravating and mitigating circumstances will be considered when administering corrective actions and decisions regarding corrective action can only be made on a case by case basis. Ex. 18, Progressive Corrective Action Policy at Bates D000306.

**RESPONSE: UNCONTROVERTED.**

59     If an employee on an active Level Three Final Warning receives another written warning within nine months, this does not necessarily mean that his or her employment will be terminated. Rather, whether the employee is terminated can depend on the severity of the employee's infraction. Ex. 4, Clifford Dep. at 96:13-97:4.

 **RESPONSE: UNCONTROVERTED.**

60     Plaintiff received discipline prior to registering her complaint about Mr. Richardson. Ex. 1, Pl. Dep. at 171:23-172:1.

**RESPONSE: UNCONTROVERTED.**

61     Prior to making her complaint about Mr. Richardson, Plaintiff was suspended for violating policy on May 11, 2015 when she failed to perform required metal detector checks on food product and falsely documented that she had run such checks. Ex. 1, Pl. Dep. at 135:2-16, 140:17-141:8; Ex. 4, Clifford Dep. 152:1-17; Corrective Action Effective May 11, 2015 (Ex. 37 to Clifford Dep.), attached hereto as Exhibit 19. Plaintiff's violation resulted in 50 pallets of product being placed on hold to be tested for metal. Ex. 19, Corrective Action Effective May 11, 2015.

**RESPONSE: Except as stated below, these facts are UNCONTROVERTED.**

**Tyson's suggestion that the "Corrective Action Effective May 11, 2015" was issued to Plaintiff "[p]rior to making her complaint about Mr. Richardson" is CONTROVERTED.**

   a. **Even though Plaintiff was disciplined and suspended in May 2015 for this event, Clifford issued Plaintiff a Corrective Action form for this event on October 26, 2015. <u>Exhibit 16</u> (first page of Clifford Depo. Exhibit 37).**

**b. The write-up was not given to Plaintiff until she filed her EEOC Charge of Discrimination, and the fact that Plaintiff was written-up for something that had already been addressed six months prior made her feel like she was being punished for filing the Charge of Discrimination. Ex. 6, 217:16 – 218:15.**

62      Prior to making her complaint about Mr. Richardson, Plaintiff and two co-workers were given verbal reminders for failing to comply with their end of shift responsibilities. Ex. 4, Clifford Dep. at 157:14-23; Corrective Action Effective September 1, 2015 (Ex. 38 to Clifford Dep.), attached hereto as Exhibit 20; Corrective Actions for Kim Cobb and Carrie Walker, attached hereto as Exhibit 21.

**RESPONSE: CONTROVERTED. Although this issue was addressed on September 4, 2015, Plaintiff was not issued a write-up for the event until after she reported sexual harassment and filed a Charge of Discrimination with the EEOC.**

**a. On September 14, 2015, Clifford told Plaintiff she wished she could issue Plaintiff a write-up or fire her because of her complaint against Richardson. Ex. 6, 108:4-25.**

**b. Then on October 26, 2015, Clifford issued Plaintiff a write-up for something that occurred on September 1, 2015, which had been addressed on September 4, 2015. Ex. 6, 218:16-24; 219:23-25; Ex. 1, 157:14 – 158:9; Exhibit 17, Corrective Action Form (Depo. Exhibit 38).**

**c. By the time Clifford issued Plaintiff the write-up, she knew Plaintiff had opposed sexual harassment by reporting it both internally to Tyson, and externally to the EEOC. Ex. 1, 157:24 – 158:5.**

**d. Clifford was provided a copy of Plaintiff's initial EEOC Charge of Discrimination on October 15, 2015, and she read it at that time. Ex. 1, 125:12-20; 126:4 – 127:12; Exhibit 18, (Clifford Depo. Exhibit 28).**

63      Tyson has issued corrective action to at least four other employees at its Kansas City, Kansas facility for committing violations similar to the violation for which Plaintiff, Ms. Walker and Ms. Cobb were issued Documented Conversations Effective September 1, 2015, including:

a.      Production Technician Chris Brownwell, issued Level 1 Documented Reminder effective September 30, 2016;

b.      Production Technician Terrance Hudson, issued Level 1 Documented Reminder effective October 17, 2016;

  c.  Production Technician Perry Monk, issued Level 2 Written Reminder effective September 29, 2016, and

  d.  Production Technician Enoch Ragsdale, issued Documented Conversation effective October 17, 2016.

Corrective Actions for Brownwell, Hudson, Monk and Ragsdale, attached hereto as Exhibit 22.

**RESPONSE: UNCONTROVERTED but IMMATERIAL. This proves nothing without an inference being drawn in Tyson's favor, which is forbidden when deciding Tyson's motion for summary judgment.** *See Tolan v. Cotton*, **134 S.Ct. 1861, 1863; 1868 (U.S. 2014).**

  64  On October 25, 2015, Tyson Food Safety and Quality Assurance Supervisor Crystal Smith proposed that a corrective action be issued to Plaintiff as a result of an infraction Plaintiff committed on October 23, 2015. Specifically, Plaintiff failed to follow the changeover procedure and used cardstock samples with an incorrect code date, resulting in 42 cases of product that had to be re-worked. Ex. 4, Clifford Dep. at 146:11-24; Oct. 25, 2015 Email and Proposed Corrective Action (Ex. 36 to Clifford Dep.), attached hereto as Exhibit 23.

**RESPONSE: UNCONTROVERTED.**

  65  Ms. Clifford notified her supervisor, Group Human Resources Manager Nina Erickson, of this proposed corrective action and the fact that Plaintiff was on an active Level 3 Final Warning from May 2015. Ex. 4, Clifford Dep. at 146:25-147:5, 147:19-148:3.

**RESPONSE: UNCONTROVERTED.**

  66  Ms. Erickson asked to review the corrective actions in Plaintiff's file in order to determine whether Plaintiff's violation warranted termination. Ex. 4, Clifford Dep. at 148:4-149:9, 152:1-7, 156:24-157:2; Ex. 23, Oct. 25, 2015 Email and Proposed Corrective Action; Ex. 3, Erickson Dep. at 81:3-15.

**RESPONSE: UNCONTROVERTED.**

  67  In reviewing Plaintiff's file for prior corrective actions, Ms. Clifford realized that Plaintiff had never signed the May 11, 2015 Level 3 Final Warning or the September 1, 2015

Documented Conversation and therefore obtained Plaintiff's signature on these corrective actions

on October 26, 2015. Ex. 4, Clifford Dep. at 154:22-155:9, 159:1-3, 160:7-19; Ex. 3, Erickson

Dep. at 84:1-25, 85:10-20.

**RESPONSE: CONTROVERTED.**

    a. **On September 14, 2015, Clifford told Plaintiff she wished she could issue Plaintiff a write-up or fire her because of her complaint against Richardson. <u>Ex. 6</u>, 108:4-25.**

    b. **Then on October 26, 2015, Clifford issued Plaintiff a write-up for something that occurred on September 1, 2015, which had been addressed on September 4, 2015. <u>Ex. 6</u>, 218:16-24; 219:23-25; <u>Ex. 1</u>, 157:14 – 158:9; <u>Exhibit 17</u>, Corrective Action Form (Depo. Exhibit 38).**

    c. **By the time Clifford issued Plaintiff the write-up, she knew Plaintiff had opposed sexual harassment by reporting it both internally to Tyson, and externally to the EEOC. <u>Ex. 1</u>, 157:24 – 158:5.**

    d. **Clifford was provided a copy of Plaintiff's initial EEOC Charge of Discrimination on October 15, 2015, and she read it at that time. <u>Ex. 1</u>, 125:12-20; 126:4 – 127:12; <u>Exhibit 18</u>, (Clifford Depo. Exhibit 28).**

    e. **Even though Plaintiff was disciplined and suspended for her conduct in May 2015, Clifford issued Plaintiff a Corrective Action form for this event for the first time on October 26, 2015. <u>Exhibit 16</u> (first page of Clifford Depo. Exhibit 37).**

68    Tyson ultimately decided against issuing Plaintiff any corrective action for her

October 23, 2015 infraction. Ex. 4, Clifford Dep. at 149:15-19.

**RESPONSE: UNCONTROVERTED but IMMATERIAL. This proves nothing without an inference being drawn in Tyson's favor, which is forbidden when deciding Tyson's motion for summary judgment. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863; 1868 (U.S. 2014).**

69    On February 2, 2016, Plaintiff violated company policy by using incorrect

cardstock samples and falsely documenting that she had collected the correct cardstock. Ex. 4,

Clifford Dep. at 160:21-161:3; Corrective Action Effective February 2, 2016 (Ex. 39 to Clifford

Dep.) attached hereto as Exhibit 24; Ex. 1, Plaintiff Dep. at 148:8-16.

**RESPONSE: UNCONTROVERTED.**

70      Plaintiff acknowledges that she was not concentrating like she should have been and should have probably paid more attention. Ex. 1, Plaintiff Dep. at 149:20-150:7.

**RESPONSE: UNCONTROVERTED.**

71      Plaintiff's violation resulted in 14 pallets of product being placed on hold. Ex. 24, Corrective Action Effective February 2, 2016.

**RESPONSE: UNCONTROVERTED.**

72      Though Plaintiff's Level 3 Final Warning from May 11, 2015 was still active, Tyson did not terminate Plaintiff's employment. Ex. 1, Pl. Dep. at 151:5-16, 153:5-8, 153:18-20. Rather, Tyson issued Plaintiff a Level 2 Written Reminder. Ex. 1, Pl. Dep. at 146:22-147:24; Ex. 24, Corrective Action Effective February 2, 2016.

**RESPONSE: UNCONTROVERTED but IMMATERIAL. This proves nothing without an inference being drawn in Tyson's favor, which is forbidden when deciding Tyson's motion for summary judgment.** *See Tolan v. Cotton*, **134 S.Ct. 1861, 1863; 1868 (U.S. 2014).**

**Tyson's suggestion that Plaintiff received special treatment is CONTROVERTED.**

    a.  **Richardson received a Level 3 Write-Up on September 14, 2015 for giving Kim Cobb naked pictures of himself outside of work. <u>Exhibit 14</u>.**

    b.  **A level 3 write-up is supposed to be active for nine months. <u>Ex. 7</u>, 24:6-12; <u>Ex. 22.</u>**

    c.  **June 14, 2016 is nine months after September 14, 2015.**

    d.  **On January 13, 2016, Richardson was written-up again but only received a Level 1 Write-Up. <u>Ex. 2</u>, 57:2-7.**

    e.  **During February 2016 Richardson was written-up again but only received a Level 2 Write-Up. <u>Ex. 2</u>, 58:25 – 59:23.**

    f.  **On March 22, 2016 Richardson was written-up again but only received a Level 3 Write-Up. <u>Ex. 2</u>, 59:25 – 60:10.**

73      Tyson has issued Level 2 Written Reminder corrective actions to at least two other employees at its Kansas City, Kansas facility for engaging in similar violations. Effective January 27, 2016, another employee in Plaintiff's department, Jason Ellingburg, was also issued a Level 2

Written Reminder for a similar policy violation that resulted in 15 pallets of product being placed on hold. Effective December 19, 2016, Production Technician Mindy Tschudi was also issued a Level 2 Written Reminder for a similar policy violation that resulted in more than four pallets of product being placed on hold. Corrective Actions for Ellingburg and Tschudi, attached hereto as Exhibit 25.

**RESPONSE: UNCONTROVERTED but IMMATERIAL. This proves nothing without an inference being drawn in Tyson's favor, which is forbidden when deciding Tyson's motion for summary judgment.** *See Tolan v. Cotton*, **134 S.Ct. 1861, 1863; 1868 (U.S. 2014).**

74     On April 18, 2016, Plaintiff was absent from the production floor for an unauthorized period of time. Ex. 4, Clifford Dep. at 162:18-163:2; Corrective Action Effective April 22, 2016 (Ex. 41 to Clifford Dep.), attached hereto as Exhibit 26.

**RESPONSE: CONTROVERTED.**

   a. **Plaintiff was given a Level 3 write-up on April 29, 2016 for allegedly taking a "50 minute lunch break." Ex. 1; 162:14 – 163:2; Exhibit 19, Hourly Corrective Action Form (first page of Clifford Depo. Exhibit 41); Ex. 6, 155:13-24.**

   b. **Plaintiff did not take a 50-minute lunch break. Plaintiff was working in the mezzanine, where it is warm, and then was sent to the production floor, where it is cold, so she stopped in the locker room to put more clothes on and to use the restroom. Ex. 6, 156:14-23. While Plaintiff was using the restroom, a co-worker entered the locker room and told Plaintiff that Team Lead Cooper had told them to go to lunch break. Ex. 6, 156:24- 157:7.**

   c. **Team Members are allowed to go to the bathroom during work. Ex.1, 163:8-10.**

   d. **Team Members do not have to ask permission to go to the bathroom during work, even though it is "best practice" to notify someone, according to HR Manager Clifford, in case there is an emergency and they need to do a head count. Ex. 1, 163:11-17.**

   e. **According to HR Manager Clifford, if a Team Member is in the bathroom and lunch is called, they are allowed to go to lunch, but should tell someone they were in the restroom when lunch was called. Ex. 1, 164:2-6.**

   f. **The Level 3 write-up Plaintiff received on April 29, 2016 does not claim Plaintiff violated policy by failing to notify someone she was in the bathroom. Ex. 1, 165:25 – 166:7.**

g. **Although Henry Smith issued Plaintiff the write-up, he told Plaintiff that "they" wanted Plaintiff to be terminated without mentioning names. Ex. 6, 160:7 – 161:11.**

h. **On April 25, 2015, prior to Plaintiff receiving the write-up, HR Generalist Susan Fox emailed HR Manager Clifford to see if she requested permission to fire Plaintiff for taking the alleged 50-minute lunch break. Ex. 1, 166:9-24; Exhibit 20 (Clifford Depo. Exhibit 42).**

75      Tyson's review of time records and security footage from Plaintiff's shift that day revealed that Plaintiff left the production floor at 6:36 pm and did not return until 7:26 pm, thereby exceeding her authorized 30 minute break time by 20 minutes. Ex. 26, Corrective Action Effective April 22, 2016.

**RESPONSE: CONTROVERTED.**

a. **Plaintiff was not working on the production floor when she went to the locker room, she was upstairs in the mezzanine. Ex. 6, 158:15-20.**

b. **Plaintiff did not take a 50-minute lunch break. Plaintiff was working in the mezzanine, where it is warm, and then was sent to the production floor, where it is cold, so she stopped in the locker room to put more clothes on and to use the restroom. Ex. 6, 156:14-23. While Plaintiff was using the restroom, a co-worker entered the locker room and told Plaintiff that Team Lead Cooper had told them to go to lunch break. Ex. 6, 156:24- 157:7.**

c. **Team Members are allowed to go to the bathroom during work. Ex.1, 163:8-10.**

d. **Team Members do not have to ask permission to go to the bathroom during work, even though it is "best practice" to notify someone, according to HR Manager Clifford, in case there is an emergency and they need to do a head count. Ex. 1, 163:11-17.**

e. **According to HR Manager Clifford, if a Team Member is in the bathroom and lunch is called, they are allowed to go to lunch, but should tell someone they were in the restroom when lunch was called. Ex. 1, 164:2-6.**

76      As Plaintiff's Level 2 Written Reminder from February 2, 2016 was still active, Tyson issued Plaintiff a Level 3 Final Warning for this infraction. Ex. 25, Corrective Action Effective April 22, 2016; Ex. 1, Pl. Dep. at 155:10-24.

**RESPONSE: UNCONTROVERTED.**

77    Tyson has issued corrective actions to at least 26 other employees at its Kansas

City, Kansas facility for taking unauthorized extended breaks, including:

a.    RTE Production Technician Rodney Alexander, issued Level 1 Documented Reminder effective January 17, 2017;

b.    Production Technician Chris Brownwell, issued Documented Conversation effective August 29, 2016;

c.    RTE Packer Brandon Caston, issued Documented Conversation effective July 21, 2016;

d.    Production Technician Christopher Cook, issued Documented Conversation effective November 8, 2016;

e.    RTE Lead Tyrone Freeman, issued Level 2 Written Reminder effective September 21, 2016;

f.    Production Technician Andrew Hardy, issued Documented Conversation effective May 6, 2016;

g.    RTE Packer Carla Harris, issued Documented Conversation effective April 7, 2016;

h.    Production Technician Ryan Hullum, issued Level 1 Documented Reminder effective April 12, 2016;

i.    RTE Packer James Hunter, issued Documented Conversation effective March 4, 2016;

j.    RTE Packer Ted Infranca, issued Level 1 Documented Reminder effective January 27, 2016 and Level 2 Written Reminder effective April 18, 2016;

k.    Production Technician Brandon Jones, issued Level 2 Written Reminder effective June 20, 2016;

l.    Packer Richard Jones, issued Level 1 Documented Reminder effective January 13, 2017;

m.    Production Technician Sourisack Keodara, issued Level 1 Documented Reminder effective January 28, 2016;

n.    RTE Packer Errin King, issued Documented Conversation effective January 27, 2016;

o.    RTE Packer Christopher Kirby, issued Documented Conversation effective January 27, 2016;

p.    RTE Packer Gary Knott, issued Documented Conversation effective January 21, 2016;

q.    Production Technician Lorenzo McCain, issued Level 2 Written Reminder effective January 16, 2017;

r.    RTE Packer Melton McIntosh, issued Level 1 Documented Reminder effective February 2, 2016;

s.    Production Technician Perry Monk, issued Documented Conversation effective May 23, 2016;

t.    RTE Packer Craig Newton, issued Documented Conversation effective July 21, 2016;

u.    RTE Packer Ed Richmond, issued Level 3 Final Warning effective April 18, 2016 and Level 3 Final Warning effective May 19, 2016;

> v.   Production Technician Daniel Rivera, issued Level 1 Documented Reminder effective May 23, 2016;
>
> w.   Production Technician Geronie Sanford, issued Level 1 Documented Reminder effective January 28, 2016;
>
> x.   RTE Lead Keith Todd, issued Level 1 Documented Reminder effective September 21, 2016;
>
> y.   RTE Packer Carrie Walker, issued Documented Conversation effective March 1, 2016 and Level 1 Documented Reminder effective May 19, 2016, and
>
> z.   Production Technician William Young, issued Documented Conversation effective December 29, 2016.

Corrective Actions for Unauthorized Extended Breaks, attached hereto as Exhibit 27.

**RESPONSE: UNCONTROVERTED but IMMATERIAL. This proves nothing without an inference being drawn in Tyson's favor, which is forbidden when deciding Tyson's motion for summary judgment. *See Tolan v. Cotton*, 134 S.Ct. 1861, 1863; 1868 (U.S. 2014).**

78     On October 10, 2016, Plaintiff was issued a Documented Conversation corrective action for failing to wear her safety glasses on the production floor. Ex. 4, Clifford Dep. at 167:13-22; Corrective Action Effective October 10, 2016 (Ex. 43 to Clifford Dep.), attached hereto as Exhibit 28.

**RESPONSE: UNCONTROVERTED.**

79     On October 2, 2015, Plaintiff filed with the EEOC a Charge of Discrimination against The Hillshire Brands Company, checking the boxes for discrimination based on sex and retaliation beginning on September 9, 2015. The EEOC assigned this Charge number 563-2016-00031 and later amended this Charge to add Defendant as a Respondent. Pretrial Order, § 2(a)(6); Plaintiff's Charge of Discrimination, Ex. B to Pl. First Am. Compl. (ECF 15).

**RESPONSE: UNCONTROVERTED.**

80     On April 20, 2016, the EEOC mailed Plaintiff a Notice of Right to Sue for Charge number 563-2016-00031. Pretrial Order, § 2(a)(7).

**RESPONSE: UNCONTROVERTED.**

81      On July 14, 2016, Plaintiff filed with the EEOC a second Charge of Discrimination against Defendant, checking the boxes for discrimination based on sex and retaliation through April 30, 2016. The EEOC assigned the Charge number 563-2016-01790. *Id.* at § 2(a)(9); Plaintiff's Charge of Discrimination, Ex. B to Pl. First Am. Compl. (ECF 15).

**RESPONSE: UNCONTROVERTED.**

82      The EEOC issued Plaintiff a Notice of Right to Sue on August 3, 2016. Pretrial Order, § 2(a)(10).

**RESPONSE: UNCONTROVERTED.**

83      Plaintiff's First Amended Complaint was filed on October 26, 2016 as an attachment to Plaintiff's Motion for Leave to File First Amended Complaint. *Id.* at § 2(a)(11).

**RESPONSE: UNCONTROVERTED**

- - -

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

**I.      HR Manager Clifford Prefers Not to "Incriminate" Employees for Discrimination**

84.     Clifford provides her cell phone number to employees so they may contact her while she is not normally in the office, such as during second shift. Ex. 1, 27:13-16.

85.     On August 11, 2015, prior to the events at issue in this case, Plaintiff and Clifford had a conversation through text messaging. *See* Exhibit 29, Texts; Doc. 41, *Pretrial Order* at 7, ¶26.

86.     On August 11, 2015, Plaintiff reported to Clifford, through text messages, that one employee had called another one an "ignorant black M.F." Ex. 29, pages marked T. Thompson 000058 – 59.

87.     Clifford acknowledged that one employee calling another employee "an ignorant black M.F. [would] violate Tyson Food's EEO policies." Ex. 1, 26:24 – 27:1.

88.     In the texts, Clifford responded by thanking Plaintiff for coming forward with her concerns, but also stated, "I have ways of dealing with things that aren't incriminating to anyone…." Ex. 29, at T. Thompson 000059.

89.     Clifford admitted she never did anything in response to Plaintiff's texts on about the racially-motivated comments she heard. Ex. 1, 27:2-5.

## II.     Every Tyson Employee is Required to Report Sexual Harassment

90.     Nina Erickson testified on behalf of Tyson as its corporate representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. Ex.7, 9:3-23; Exhibit 9, Amended Notice to Take Videotaped Deposition of Tyson Foods, Inc. (Erickson Depo. Exhibit 63).

91.     Erickson testified on behalf of Tyson regarding the "contents, application, and use of … [its] EEO, harassment, and retaliation policies." Ex. 9, ¶1; Ex. 7, 12:18 – 13:11; Ex. 8 (Erickson Depo. Exhibit 64).

92.     Tyson's Harassment and Discrimination Policy is designed to ensure compliance with federal, state, and local employment laws. Ex. 7, 15:16-20; 16:4-9.

93.     Tyson's Harassment and Discrimination Policy prohibits "any kind of unlawful harassment." Ex. 8 (pp. D001225; D001227, §3.1).

94.     Tyson's Harassment and Discrimination Policy defines harassment, sexual harassment, hostile work environment, employment discrimination, and retaliation in a manner which is consistent with federal law. *See* Ex.8, (D001229, §6.1.1 - §6.1.5).

95.      Tyson's Harassment and Discrimination Policy requires every "Team Member" to report harassment, sexual harassment, and hostile work environments based on sex that they "witness, experience, and/or learn about." Ex.7, 12:18 – 13:11; 17:11-22; Ex. 8 (pp. D001225; D001227, § 3.4; D001228, §4.1;).

96. Team Members have an obligation under company policy to report harassment, sexual harassment, and hostile work environments based on sex even if the harassment is not directed at them personally. Ex. 7, 17:22-24.

97. Team Members have a duty under Tyson policy to report all sexual harassment and hostile work environments based on sex that they witness or learn of. Ex. 7, 17:25 – 18:8.

98. The obligation to report sexual harassment witnessed or known of applies to all Tyson employees. Ex. 7, 18:9-11.

99. As used in Tyson's policies, including the Harassment and Discrimination Policy, the phrase "Team Member" includes every Tyson employee, both hourly employees and salaried management-level employees. Ex. 7, 13:19 – 14:8; 14:12-14.

## III. Team Leads Have a Duty to Report Sexual Harassment They Learn About from Subordinate Employees

97. If Team Leads receive a complaint of sexual harassment from an hourly employee, they are required, pursuant to Tyson policy, to further report the complaint. Ex. 7, 59:4-10.

98. Plaintiff's understanding of Team Leads is that they are "basically our supervisors. We report to them for everything." Ex. 6, 22:5-13.

99. Plaintiff's Team Leads would tell Plaintiff where to work, were the point of contact if a machine has technical problems, the Team Leads know the schedule for the shift, the Team Leads are who team members such as Plaintiff are to go to if they are having problems with other co-workers, the Team Leads handle paperwork, and can recommend discipline, Team Leads can coach team members and change team members' roles during the shift. Ex. 6, 23:13- 24:6.

100. On September 9, 2015 Plaintiff reported Richardson's conduct from that day to Dejuana Stallings. Ex. 6, 62:17-22.

101. Plaintiff told Stallings about Richardson's comments, and that "he was bumping up against [her] and rubbing on the side of [her] breast." Ex. 6, 63:2-14.

102. As of September 9, 2015, Dejuana Stallings was a Team Lead. Ex. 6, 22:23 – 23:1.

103. Plaintiff reported Richardson to Team Lead Stallings again on September 10, 2015, and in response, Stallings said she would forward Plaintiff's concerns. Ex. 6, 64:8 – 65:21.

104. On September 10, 2015, Plaintiff told Stallings that Richardson was continuing to make sexual comments and suggestive comments about pictures. Ex. 6, 66:2-9; Ex. 7, 57:1-24.

105. On September 10, 2015, Plaintiff also reported Richardson's conduct to June Penn on September 10, 2015. Ex. 6, 67:14-18.

106. At that time, June Penn was also a Team Lead. Ex. 1, 65:21 – 66:2.

107. Tyson admits that if its employees followed its Harassment and Discrimination Policy, Team Leads Stallings and Penn should have reported Plaintiff's complaints of sexual harassment immediately upon receiving them. Ex. 7, 57:25 – 58:7.

108. Tyson admits both Team Leads Stallings and Penn knew about the harassment no later than September 10, 2015. Ex. 7, 60:2-6.

109. If Tyson policy was followed Team Leads Stallings and Penn should have reported Plaintiff's sexual harassment by September 10, 2015. Ex. 7, 58:5-7; 59:19 – 60:1.

110. Neither Team Lead Stallings, nor Team Lead Penn, reported Plaintiff's complaint of sexual harassment on September 10, 2015. Ex. 7, 58:8-9; 60:7-13.

111. The harassment continued into September 11, 2015. Ex. 7, 60:11-13.

112. Plaintiff reported the sexual harassment to Stallings again on September 11, 2015. Ex. 7, 58:10-19.

113. Team Lead Stallings failed to forward Plaintiff's sexual harassment complaints on September 11, 2015. Ex. 7, 58:24 – 59:2; 60:14-15.

## IV. Tyson Substantiated Plaintiff's Sexual Harassment Allegations

114. Simone Clifford, HR Manager of Tyson's facility in Kansas City, Kansas, conducted the investigation into Plaintiff's sexual harassment complaints against Richardson and Cobb. Ex. 1, 6:16-17; 9:2-5; 9:18-25; 35:22 – 36:2.

115. Clifford's investigation started on September 12, 2015. Ex. 1, 35:4-13; 35:22 – 36:2; 36:22 – 37:2; Exhibit 10, Investigation Opening Summary Form (Clifford Depo. Exhibit 4).

116. Clifford closed her investigation on September 25, 2015. Ex. 1, 41:14 - 42:8; Exhibit 11, Investigation Closing Summary (Clifford Depo. Exhibit 5) ("today's date" is 9/25/15).

117. Clifford substantiated all of Plaintiff's allegations. Ex. 1, 178:14-18; 180:6-16.

118. As of September 12, 2015, Plaintiff's allegations of sexual harassment included:

a. The very first time Plaintiff worked with Richardson, he asked her if she had a boyfriend and then told her that her boyfriend was "lucky." Ex. 6, 58:20 – 59:3.

b. Richardson told Plaintiff her boyfriend was "lucky" three times. Ex. 6, 59:4-6.

c. When Plaintiff mentioned that she was engaged, Richardson asked her if she was looking for a stripper. Ex. 6, 59:7-9; 13-15.

d. Richardson told Plaintiff that he strips in St. Louis. Ex.6, 59:19-21.

e. Richardson made suggestive noises towards Plaintiff. Ex. 6, 59:22 – 60:4.

f. When Plaintiff touched Richardson to move him out of the way, he said it "felt good" and that his "wife's never touched him like that." Ex. 6, 59:22 – 60:11.

g. Richardson brushed up against Plaintiff's breast. Ex. 6, 60:25 – 61:4. This was reported to Team Lead Stallings on September 9, 2015. Ex. 6, 62:17 – 63:14.

h. Richardson kept asking Plaintiff about his offer to strip for her even though she kept telling him she was not interested. Ex. 6, 64:8-20.

i. Richardson told Plaintiff he gave female co-worker Kim Cobb some pictures and that she could look at them, but not let a supervisor see them. Ex. 6, 64:21 – 65:9.

j. Richardson told Plaintiff she was "not ready for that." Ex. 6, 65:9-14.

k. Richardson yelled and screamed at Plaintiff when she talked to other males. Ex. 6, 69:17 – 70:6.

l. Richardson told Plaintiff that she reminded him of his wife because she would talk to and laugh with other men at work, but not with him. Ex. 6, 70:12-22.

m. Richardson told Plaintiff he would be mad at her if she was his wife. Ex. 6, 71:1-5.

n. Richardson kept "touching her shoulder." Ex. 13.

o. Richardson would "walk[] up behind her and talk[] really close to her." Ex. 13.

p. Richardson kept walking behind Plaintiff making noises. Ex. 6, 71:6-8.

q. Richardson told Plaintiff she looked good when she was wearing her non-work clothes. Ex. 6, 71:17-20.

r. Richardson sent Plaintiff a Facebook friend request at 2:30 AM. Ex. 6, 71:21-23.

s. Richardson grabbed Plaintiff's arm and told her to leave with him. Ex. 6, 74:1-8; 220:23 – 221:14.

t. Kim Cobb showed naked pictures of Richardson to Plaintiff in the locker room that showed Richardson's penis. Ex. 6, 75:1-7; 75:16-19.

119. Tyson policy required Clifford to interview Plaintiff immediately as part of her investigation. Ex. 7, 39:24 – 40:2.

120.     Clifford never interviewed Plaintiff as part of her investigation, and never sat down with Plaintiff to find out the specific nature of the complaint. Ex. 1, 41:1-13.

121.     In her role as HR Manager, Clifford concluded that Richardson harassed Plaintiff over a three-day period. Ex. 1, 44:22 – 45:1.

122.     Even though Clifford had a written statement on September 12, 2015 stating that Plaintiff claimed Richardson touched her, she never asked Plaintiff or Richardson about the alleged touching. Ex. 1, 50:24 – 51:20.

123.     Clifford claimed she did not need to ask Richardson about the touching because she knew the allegation was true. Ex. 1, 51:8-17.

124.     Clifford admitted that Richardson "absolutely" violated Tyson's harassment policy by offering to strip for Plaintiff and by comparing Plaintiff to his own wife. Ex. 6, 45:6-12.

125.     Clifford admitted Richardson also violated Tyson's sexual harassment policy by sending naked pictures and by having personal conversations with Plaintiff. Ex. 1, 53:5-23.

## V.     Clifford Retaliates Against the Employees Who Corroborated Plaintiff's Complaint

126.     Tyson admits that writing-up employees for participating in an investigation into sexual harassment and providing truthful statements is retaliation under Tyson's policies. Ex. 7, 46:12-16.

127.     On September 12, 2015 HR Manager Clifford received notice of Plaintiff's sexual harassment complaint against Richardson when she received a phone call from Value Stream Manager Nathan Pease. Ex. 1, 32:18 – 33:18; 36:22 – 37:2.

128.     Clifford instructed Pease to gather witness statements from all the employees who saw the naked pictures of Richardson. Ex. 1, 34:1 – 35:3.

129.     On September 12, 2015 Shamika Vincent wrote a statement corroborating that Kim Cobb showed Plaintiff and other female employees naked pictures of Richardson. Ex. 1 55:3-8; 55:21-24; Exhibit 23 (Clifford Depo. Exhibit 9).

130.     Clifford never followed-up with Vincent. Ex. 1, 56:4-8.

131.     On September 12, 2015, Jackie Smith wrote a statement corroborating that Kim Cobb showed Plaintiff and other female employees naked pictures of Robinson the night before. Ex. 1 57:10-21; 58:2-11; Exhibit 24, (Clifford Depo. 10).

132.     Clifford never followed-up with Smith to ask about Richardson. Ex. 1, 58:21-23.

133.     On September 12, 2015 Alyssa Rollo wrote a statement corroborating that Kim Cobb showed Plaintiff and other female employees naked pictures of Robinson the night before. Ex. 1, 63:1-9; 63:16-20.

134.     Clifford never followed-up with Rollo. Ex. 1, 63:10-12.

135.     Clifford interviewed an employee named Sharon Peoples on September 14, 2015 because she was identified by Plaintiff as a female employee who was having problems with Richardson. Ex. 1, 83:23 – 84:5; Exhibit 26, (Clifford Depo. Exhibit 19).

136.     On September 14, 2015, Peoples told Clifford she thought Richardson was "creepy" because of his comments and that other people had the same opinion, but Clifford deliberately chose not to ask Peoples for examples or follow-up on that. Ex. 1, 85:9-22; 86:8 – 87:6.

137.     Richardson worked with Peoples in the clean room before he transferred to the department where Plaintiff worked. Ex. 1, 87:24 – 88:6.

138.     Based on the information gathered during her investigation, Clifford concluded that if Peoples followed Tyson's sexual harassment policy, she would have reported Richardson for sexual harassment when he was working with Peoples in the clean room. Ex. 1; 88:7-25.

139.	When Clifford issued Richardson the Level-3 write-up on September 14, 2015, Richardson told Clifford he felt like the "victim." Ex. 2, 40:14-19.

140.	Richardson told Clifford he was the "victim" because he gave the naked pictures to Cobb, but claimed he told her not to show them at work. Ex.2, 43:23 – 44:2.

141.	Clifford was sympathetic to Richardson being the "victim." Ex. 2, 40:20-21.

142.	On September 17, 2014 Clifford issued Jackie Smith a write-up. Ex. 1, 60:7-10; Exhibit 27, (Clifford Depo. Exhibit 11).

143.	Clifford issued Smith the write-up because Kim Cobb showed her the naked pictures of Richardson. Ex. 1, 62:20-23.

144.	Clifford knew Smith saw the pictures because Smith provided a truthful statement in the investigation into Plaintiff's sexual harassment complaint. Ex. 1, 60:15-20.

145.	Clifford issued Smith the write-up even though she knew Smith was disgusted by the pictures. Ex. 1, 61:3-9; 94:13-15.

146.	On September 17, 2014, Clifford issued Alyssa Rollo a write-up simply for being shown naked pictures of Richardson by Kim Cobb. Ex. 1, 64:7-15; Exhibit 25 (Clifford Depo. Exhibit 13).

147.	On September 17, 2014, Clifford issued Peoples a write-up simply for being shown the naked pictures of Richardson by Kim Cobb. Ex. 1, 92:1 – 93:4; Exhibit 28 (Clifford Depo. Exhibit 20).

## VI.	Clifford Retaliates Against Plaintiff for Making Richardson the "Victim"

148.	Tyson admits that if an HR Manager threatens or intimidates an employee for making a complaint of sexual harassment, that would qualify as retaliation under its policy prohibiting retaliation. Ex. 7, 21:7-17; 22:1-6.

149.     After Richardson told HR Manager Clifford that he felt like he was the real "victim" in the situation, *see* Ex. 2, 40:14-21; 42:23 – 44:2, Clifford approached Plaintiff. Ex. 6, 108:4-21.

150.     Clifford's opinion was that every person who saw the pictures should have been written-up. Ex. 1, 61:14-16; 62:2-5.

151.     On September 17, 2015, Clifford wrote-up three female employees who had all corroborated parts of Plaintiff's complaint of sexual harassment. Ex. 1, 57:10-21, 58:2-11 (Smith Statement); 60:7-10 (Smith Write-Up); 63:1-9, 63:16-20 (Rollo Statement); 64:7-15 (Rollo Write-Up) 83:23 – 84:5, 85:9-22, 86:8 – 87:6 (Peoples Interview); 92:1 – 93:4 (Peoples Write-Up).

152.     The other female employees who were written-up told Plaintiff that Clifford threatened to fire them because Cobb showed them the naked pictures. Ex. 6, 107:11-24.

153.     Clifford then told Plaintiff she should issue Plaintiff a write-up also or fire her because of her complaint against Richardson. Ex. 6, 108:4-21.

154.     Clifford told Plaintiff, "Because now Tony [Richardson] is the victim. If it wasn't for you telling anyone, he wouldn't be the victim, but because of you, everyone's running around calling him Mr. Nasty Man." Ex. 6, 108:21-25.

155.     Clifford also reprimanded Plaintiff by reminding her that she had Clifford's personal number and told Plaintiff she should have contacted Clifford directly instead of reporting the harassment at work. Ex. 6, 108:25 – 109:2.

156.     Clifford told Plaintiff that, as it related to the incidents with Richardson, she was "being too sensitive" and "blowing things out of proportion." Ex. 6, 166:9-21.

**VII.     Richardson Was Never Punished for His Conduct Toward Plaintiff**

157.     Clifford issued Richardson a Level 3 write-up on September 14, 2015. Exhibit 14, Hourly Corrective Action form (Clifford Depo. Exhibit 21).

158.    Richardson thinks he received the write-up for giving naked pictures of himself to female co-worker Kim Cobb. Ex. 2, 39:2-8; 39:15 – 40:2.

159.    On the Level 3 Write-Up that Richardson received on September 14, 2015, the "Reason for Counseling" provided refers only to Richardson sharing vulgar photographs with a co-worker outside of work; the "Reason for Counseling" section contains no reference to Richardson making comments to or touching Plaintiff. Exhibit 14.

160.    When Clifford issued Richardson the write-up, she talked about Cobb and the pictures; Richardson cannot recall any conversation about Plaintiff or his interactions with Plaintiff in relation to the write-up. Ex. 2, 41:7-15.

161.    Richardson does not know the write-up was supposedly issued to him for the way he spoke to or interacted with Plaintiff. Ex. 2, 41:12-15.

162.    Richardson does not think he ever received a write-up for the way he interacted with Plaintiff. Ex. 2, 55:9-19.

**VIII.    Instead, Richardson was Rewarded, in Violation of Tyson Policy**

163.    Erickson testified as Tyson's 30(b)(6) corporate representative regarding Tyson's "Progressive discipline policies and practices, including all policies and practices related to the use, purpose, and effect of the Hourly Corrective Action Form and the various levels of discipline identified thereon." Ex. 7, 9:15-23; Ex. 9, ¶1(b).

164.    Erickson testified as Tyson's 30(b)(6) corporate representative regarding Tyson's "Policies and practices related to transfers, promotions, and the compensation of hourly employees." Ex. 7, 9:15-23; Ex. 9, ¶1(c).

165.     Under Tyson's Progressive Discipline Policy, an employee can receive a level one, level two, or level three write up. <u>Ex. 7</u>, 23:9-20; 24:2-15; <u>Exhibit 22</u>, Progressive Discipline Policy (Clifford Depo. Exhibit 2).

166.     A level one write-up is "active" for three months. <u>Ex. 7</u>, 24:6-12; Ex<u>. 22.</u>

167.     A level two write-up is "active" for six months. <u>Ex. 7</u>, 24:6-12; <u>Ex. 22</u>.

168.     A level three write-up is "active" for nine months. <u>Ex. 7</u>, 24:6-12; <u>Ex. 22.</u>

169.     An "active" write-up is supposed to "preclude [an employee] from switching jobs." <u>Ex. 7</u>, 24:16-21.

170.     The general rule is that an employee with an "active" write-up is not allowed to acquire a transfer at their own request. <u>Ex. 7</u>, 24:22 – 25:4.

171.     Richardson understood that under the progressive disciplinary policy, if he had an active Level 3 Warning he was not supposed to obtain a transfer at his request for nine months. <u>Ex. 2</u>, 83:11-21.

172.     Tyson recognizes that giving an employee a raise is not an effective form of discipline because it is not an effective way to stop the unwanted behavior. <u>Ex. 7</u>, 26:8-10, 22-25.

173.     Richardson had transferred to Plaintiff's department from a different department on September 9, 2015. Doc. 41, *Pretrial Order*, ¶(3)(b).

174.     When Richardson transferred to Plaintiff's department, he did not know his pay had been reduced to $16.65 until more than one week after he had first worked with Plaintiff in her department. <u>Ex. 2</u>, 21:14 – 22:5; 23:14-16.

175.     When Richardson found out his pay had been reduced, he went and spoke with Clifford to complain about his pay reduction. <u>Ex. 2</u>, 23:6-13.

176. In response, HR Manager Clifford offered Richardson a transfer to the warehouse, so he would make $17.50 per hour; this prompted him to request the transfer to the warehouse. Ex. 2, 23:6-13; 23:17-25; 61:20 - 62:1.

177. Richardson transferred to the Warehouse because he requested the transfer so that he could get a raise. Ex. 2, 61:20 – 62:1; 63:1-6.

178. Richardson received a raise for transferring to the warehouse. Ex. 2, 24:21-23.

179. Richardson believes the sole reason he was being transferred to the warehouse was because he requested it so he could get a raise. Ex. 2, 24:24 – 25:1; 25:11-21; 26:9-11; 63:4-6.

180. Richardson was never told he was being transferred to the warehouse as a form of punishment, or that it was related to Plaintiff's complaints against him. Ex. 2, 26:3-8; 62:16-19.

181. As far as Richardson knew, his transfer to the warehouse had nothing to do with his naked pictures. Ex. 2, 27:5-8.

182. As far as Richardson knew, his transfer to the warehouse had nothing to do with Plaintiff's complaint against him. Ex. 2, 27:9-11; 62:16 - 63:3.

183. The request to have Richardson transferred to the warehouse was made on October 5, 2015. Ex. 1, 116:1 – 117:13; Exhibit 21, Internal Transfer Request (Clifford Exhibit 26).

184. Richardson transferred to the Warehouse because he requested it, which occurred just a few weeks after being put on a Level 3 Write-Up. Ex. 2, 61:20 – 62:1; 63:1-6; 83:22 – 84:19.

185. Richardson understood the sole reason he was being transferred to the warehouse was because he requested it so he could get a raise. Ex. 2, 24:24 – 25:1; 25:11-21; 26:9-11.

IX.     **Unsurprisingly, Richardson's Harassment of Female Employees Continues**

186. Lakeyah Diane Gatson is currently employed by Tyson, and has been since October 26, 2015. Exhibit 30, Declaration of Lakeyah Diane Gatson, ¶¶1-2.

187. Gatson only knows Richardson through employment with Tyson. Ex. 30, ¶¶4-6.

188. Richardson has been sexually harassing Gatson since the fall of 2016. Ex. 30, ¶7.

189. Richardson makes comments to Gatson about her physical appearance. Ex. 30, ¶9.

190. Richardson stands very close to Gatson's backside. Ex. 30, ¶10.

191. Richardson told Gatson she was attractive when she removed her frock. Ex.30, ¶14.

192. Richardson has asked for Gatson's number, offered to drive her home, and asked her where she lives. Ex. 30, ¶¶11-19.

193. Richardson tells Gatson he used to be a "dancer" and "stripper." Ex. 30, ¶¶20-21.

194. Richardson tells Gatson about his experiences as a "dancer" and has told Gatson that he is "looking for one more party." Ex. 30, ¶¶23-24.

195. Richardson sent Gatson a picture of himself wearing a G-String. Ex. 30, ¶25.

196. Richardson sent Gatson sexually-suggestive music. Ex. 30, ¶26.

197. Gatson has never welcomed Richardson's comments; conversely, she has walked away, ignored him, and asked him to stop. Ex. 30, ¶¶15, 27, 28.

198. Richardson told Gatson that he had previously been in trouble at work for "coming on to" another female employee (whom was not Plaintiff). Ex. 30, ¶¶32-35.

199. Richardson's conduct toward Gatson has caused her to change her conduct in the workplace to avoid encountering him, it has caused Gatson to fear Richardson, and it has caused Gatson to take affirmative steps to help other female employees avoid suffering similar conduct from Richardson. Ex. 30, ¶¶36-40.

## X.  Richardson Continues to Intimidate Plaintiff

200. As of March 27, 2017, Plaintiff was still dealing with Richardson every day at work. Ex. 6, 201:6-15.

201.    Dealing with Richardson every day makes Plaintiff very uncomfortable at work. Ex. 6, 201:17-18; 205:18-20.

202.    When Plaintiff walks near Richardson or in his path, he makes exaggerated gestures giving Plaintiff the right-of-way, which makes her feel embarrassed and frustrated because he does it in a sarcastic way where other people can see it. Exhibit 38, Declaration of Tonia Thompson, ¶¶15-16.

203.    On or about June 23, 2017, Richardson invaded Plaintiff's personal space at work by walking circles around her in an intimidating manner. Ex. 38, ¶17.

204.    Richardson's conduct was very troubling to Plaintiff and caused her to be intimidated and nervous. Ex. 38, ¶17.

## XI.    Tyson's Recognizes Written Discipline is Designed to Dissuade Employees from Continuing Unacceptable Behavior

205.    The reason Tyson issues discipline to employees is because the employee did something unacceptable. Ex. 7, 26:11-14.

206.    Tyson's goal in issuing written discipline to employees is to result in a change in behavior from the employee, i.e., for him or her to stop the unacceptable conduct. Ex. 7, 26:15-17.

207.    Tyson's Harassment and Discrimination Policy prohibits retaliation against any employee who reports sexual harassment. Ex. 7, 18:25 – 19:12.

208.    Tyson's Harassment and Discrimination Policy also prohibits retaliation against any employee who participates in an investigation into sexual harassment, even if the employee was not the one who made the complaint that prompted the investigation. Ex. 7, 19:13-19.

209.    Tyson's Harassment and Discrimination Policy defines "Retaliation" as "making any adverse employment decision against an individual because of their opposition to a

discriminatory or harassing practice or conduct in the workplace, or their participation in a complaint against such unlawful practices." Ex. 8, (p. D001229, § 6.1.5).

210.    Tyson admits that under its Harassment and Discrimination Policy, a write-up qualifies as retaliation if it is issued to an employee for reporting harassment. Ex. 7, 19:23 – 20:2.

## XII.    Clifford Issues Plaintiff Two Write-Ups on October 26, 2016

211.    On September 14, 2015, Clifford told Plaintiff she wished she could issue Plaintiff a write-up or fire her because of her complaint against Richardson. Ex. 6, 108:4-25.

212.    On October 15, 2015, Clifford received notice that Plaintiff filed a Charge of Discrimination with the EEOC. Ex. 1, 157:24 – 158:5.

213.    On October 15, 2015, Clifford was provided a copy of Plaintiff's initial EEOC Charge of Discrimination, and she read it at that time. Ex. 1, 125:12-20; 126:4 – 127:12; Ex.18, (Clifford Depo. Exhibit 28).

214.    Plaintiff's initial EEOC Charge makes specific allegations against Clifford, whom is referred to in the Charge as "HR." Ex. 18, page marked D000379.

215.    On October 25, 2015, Clifford emailed her direct supervisor Nina Erickson with a proposed write-up for Plaintiff based on events that occurred on October 24, 2015. Ex. 7, 79:13-24; Exhibit 31 (Erickson Depo. Exhibit 70).

216.    Clifford usually does not send proposed write-ups to Erickson, but she did so here because Plaintiff had just filed a charge of discrimination. Ex. 7, 81:16-19

217.    Erickson forwarded the email with the proposed write-up to her direct supervisor Eloy Barajas and stated that she would be asking for approval to terminate Plaintiff "(the one who filed an EEO claim)" if "everything made sense." Ex 31.

218.     Erickson then responded to Clifford and asked her to provide all the corrective actions on file for Plaintiff. Ex. 7, 80:9-16; 80:22 – 81:2; Exhibit 32 (Erickson Depo. 71).

219.     Plaintiff had been suspended in May 2015 for her performance. Ex. 1, 152:9-17; Ex. 6, 217:16-19; Ex. 7, 83:17-20.

220.     Nevertheless, Clifford issued Plaintiff a Corrective Action form for the same conduct again on October 26, 2015. Exhibit 16 (first page of Clifford Depo. Exhibit 37, marked D000118); Ex. 6, 217:20-24.

221.     Plaintiff had never received a write-up for something that occurred six months prior. Ex. 6, 218:3-6.

222.     Clifford admitted she had never heard of an employee being written-up six months after they were already punished for a performance problem. Ex. 1, 155:14-20.

223.     When Plaintiff received the write-up on October 26, 2015 for something that had occurred six months prior she felt like she was being punished for filing her complaint with the EEOC. Ex. 6, 218:7-15.

224.     On October 26, 2015, Clifford also issued Plaintiff a write-up for something that occurred on September 1, 2015, which has already been addressed on September 4, 2015. Ex. 6, 218:16-24; 219:23-25; Ex. 1, 157:14 – 158:9; Exhibit 17, (Clifford Depo. Exhibit 38).

225.     Plaintiff opposed the second October 26, 2015 write-up because the event happened on September 1, 2015 and she spoke with the Plant Manager about it on September 4, 2015, so she thought the issue had already been addressed. See Ex. 17 ("Employees Reason/Explanation").

### XIII. Plaintiff's Write-Up for the "50-Minute Lunch Break"

226. Plaintiff received a Level 3 write-up on April 29, 2016 for allegedly taking a "50 minute lunch break." <u>Ex. 1</u>; 162:14 – 163:2; <u>Exhibit 19</u>, Hourly Corrective Action Form (first page of Clifford Depo. Exhibit 41); <u>Ex. 6</u>, 155:13-24.

227. Plaintiff did not take a 50-minute lunch break. Plaintiff was working in the mezzanine, where it is warm, and then was sent to the production floor, where it is cold, so she stopped in the locker room to put more clothes on and to use the restroom. <u>Ex. 6</u>, 156:14-23. While Plaintiff was using the restroom, a co-worker entered the locker room and told Plaintiff that Team Lead Cooper had told them to go to lunch break. <u>Ex. 6</u>, 156:24- 157:7.

228. Team Members are allowed to go to the bathroom during work. <u>Ex.1</u>, 163:8-10.

229. Team Members do not have to ask permission to go to the bathroom during work, even though it is "best practice" to notify someone, according to HR Manager Clifford, in case there is an emergency and they need to do a head count. <u>Ex. 1</u>, 163:11-17.

230. According to HR Manager Clifford, if a Team Member is in the bathroom and lunch is called, they are allowed to go to lunch, but should tell someone they were in the restroom when lunch was called. <u>Ex. 1</u>, 164:2-6.

231. The Level 3 write-up Plaintiff received on April 29, 2016 does not claim Plaintiff violated policy by failing to notify someone she was in the bathroom. <u>Ex. 1</u>, 165:25 – 166:7.

232. Although Henry Smith issued Plaintiff the write-up, he told Plaintiff that "they" wanted Plaintiff to be terminated without mentioning names. <u>Ex. 6</u>, 160:7 – 161:11.

233. HR Manager Clifford has one HR employee who reports to her whose job title is HR Generalist; her name is Susan Fox, and her maiden name is Quinn. <u>Ex. 1</u>, 10:1-19.

234.     On April 25, 2015, prior to Plaintiff receiving the write-up, HR Generalist Susan Fox emailed HR Manager Clifford to see if she requested permission to fire Plaintiff for taking the alleged 50-minute lunch break. Ex. 1, 166:9-24; Exhibit 20, Fox Email with proposed Write-Up attached. (Clifford Depo. Exhibit 42).

235.     The write-up itself states that Plaintiff "left the production floor at 6:36pm." Ex.19.

236.     Plaintiff was not working on the production floor when she went to the locker room, she was upstairs in the mezzanine. Ex. 6, 158:15-20.

## XIV.  Evidence (Not Stated Elsewhere) of Clifford's Motive to Retaliate against Plaintiff or Evidence Undermining Clifford's Credibility

237.     On October 10, 2016, HR Generalist Fox issued Plaintiff a Write-Up for not wearing her safety glasses on the production floor. Ex. 1, 167:12-25; Exhibit 33 (Clifford Depo. Exhibit 43).

238.     The October 10, 2016 Write-Up was issued as a "Documented Conversation" instead of a Level Warning. Ex. 33.

239.     A Documented Conversation does not interfere with an employee's ability to obtain a promotion or transfer at his or her own request. Ex. 1, 86:2-7.

240.     However, a Documented Conversation is recorded on an Hourly Corrective Action form and is considered a form of discipline under Tyson's discipline policy, and is an official record kept in employees' personnel files. Ex. 1, 28:21 – 29:3; 47:11-13; 47:19 – 48:1.

241.     At her deposition, Clifford claimed that she was not upset that Plaintiff received merely a Documented Conversation on October 10, 2016 instead of a more severe form of discipline. Ex. 1, 168:1-5.

242.   However, after receiving a copy of the Documented Conversation from HR Generalist Susan Fox, Clifford wrote back, "WHAT? When?" Ex. 1, 169:6-11; Exhibit 34 (Clifford Depo. Exhibit 44) (all caps in original).

243.   Clifford acknowledged that she uses all caps in emails to either indicate frustration or to talk loudly. Ex. 1, 168:6-11.

244.   Susan Fox responded to Clifford the same day, explaining what occurred. Ex. 34.

245.   At her deposition, Clifford denied that when she found out about the Write-Up, she thought it was a "missed opportunity" to issue plaintiff more severe form of discipline. Ex. 1, 171:13 – 172:2.

246.   However, in response to Susan Fox's explanation, Clifford responded by writing, "UGH another missed opportunity." Exhibit 35, (Clifford Depo. Exhibit 45); Ex. 1, 172:10-15.

247.   Sometime between September 14 and 17, 2015, Plaintiff asked Clifford if there was anywhere in the facility she could transfer to so she could distance herself both from Richardson and the ongoing conversations amongst co-workers about her complaint of sexual harassment. Exhibit 36, (Clifford Depo. Exhibit 47); Ex. 1, 178:6-11; Ex.38, ¶3.

248.   In response to Plaintiff's inquiry about transferring to a new department, Clifford told Plaintiff that the "only" opening was on the "RAW side of the plant." Ex. 36; Ex. 38, ¶4.

249.   The job in the clean room was on first shift, which meant Plaintiff's pay would have decreased if she took the transfer because of the pay differential she received for working on the second shift at that time. Ex. 38, ¶4.

250.   On September 16, 2015, Plaintiff informed Clifford via text message that she preferred to work the first shift on the Raw side. Exhibit 37 (Texts); Ex. 6, 112:9 – 113:2.

251. After Richardson was transferred out of Plaintiff's department, she decided to withdraw her request to be moved. Ex. 6, 114:9 – 115:4.

252. Plaintiff did not know Richardson transferred to the warehouse. Ex. 6, 104:6-23.

253. Clifford had offered the warehouse job to Richardson because he complained about his pay about one week after he moved to Plaintiff's department. Ex. 2, 21:14 – 22:5; 23:6-25.

254. Clifford never informed Plaintiff that there was an opening in the warehouse for a higher-paying job. Ex. 38, ¶6, *see also* Ex. 36 (referencing "…the only opening…").

255. Shortly after Clifford's deposition was taken for this case, she followed Plaintiff at work, stomping her feet, making aggressive noises, and hitting things. Ex. 38, ¶14.

256. During February 2017, Plaintiff spoke to HR Manager Clifford about her interest in serving on the Retention Group, which is a group of hourly employees who speak to management on behalf of employees. Ex. 38, ¶¶8-11.

257. Clifford told Plaintiff she would be signed-up for the Retention Group. Ex. 38, ¶11.

258. Shortly thereafter, when the list of employees for the Retention Group was published, Plaintiff's name did not appear on it because Clifford never approved Plaintiff to serve on the Retention Group. Ex. 38, ¶13.

259. During September 2015 Clifford's direct supervisor was Nina Erickson. Ex. 1, 67:15-18; 68:13-15.

260. On October 29, 2015 Erickson issued Clifford a Written Warning. Ex. 12 (Clifford Depo. Exhibit 15); Ex. 1, 69:1-2.

261. The write-up related to Plaintiff's sexual harassment complaint. Ex. 1, 72:12-16.

262.     Erickson wrote Clifford up for "failing to inform [her] group HR manager and HR director about the harassment and discrimination complaint that was reported at the Kansas City plant." Ex. 12.

263.     Clifford claims Erickson lied in the write-up. Ex. 1, 73:1-12.

264.     Erickson claims she did not know about Plaintiff's sexual harassment complaints until after Plaintiff filed her Charge of Discrimination with the EEOC. Ex. 7, 40:5-11.

265.     Clifford claims that she notified Erickson of Plaintiff's complaint on September 12, 2015. Ex. 1, 67:19-23; 68:16-22.

266.     Erickson claims she was not involved in the decision to discipline Richardson. Ex. 7, 40:5-8.

267.     Clifford claims Erickson was involved in the decision to issue Richardson the Level 3 write-up. Ex. 1, 93:8-16; 95:19 – 96:7.

## ARGUMENT AND AUTHORITIES

Plaintiff makes two claims under Title VII: (I) sexual harassment; and (II) retaliation. Both claims should proceed to trial because there is sufficient evidence of each claim. Tyson has not carried its burden of showing that undisputed facts entitle it to judgment as a matter of law.

## I.   Tyson is Not Entitled to Summary Judgment on Plaintiff's Sex Discrimination Claim

"It shall be an unlawful employment practice for an employer … to discriminate against any individual … because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). This language has been interpreted to prohibit sexual harassment and hostile work environments based on sex. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998). Sexual harassment that is severe or pervasive enough to alter the conditions of the plaintiff's employment by creating an abusive working environment violates Title VII. *See id.* There is no requirement that the discrimination produce tangible, economic harm to the plaintiff. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). If harassment interferes with the plaintiff's job performance or creates an intimidating, hostile, or offensive work environment, then it runs afoul of Title VII. *See id.* at 65.

To prove her Title VII claim premised on the presence of a hostile work environment based on sex, Plaintiff must prove (1) she is female; (2) she was subjected to unwelcome conduct; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) there is a basis to impute liability to the employer. *Jones v. Wichita State Univ.*, 528 F. Supp. 2d 1222, 1237 (D. Kan. 2007). For purposes of summary judgment, the only element challenged by Tyson is the last one. Specifically, Tyson argues it is entitled to judgment as a matter of law because, based on undisputed evidence, reasonable jurors would be required to find Tyson exercised reasonable care in responding to the harassment, and this there is no basis to find it liable for the harassment. However, Tyson's version of the facts is

controversial, ignores key facts, and is genuinely disputed. There is a sufficient basis to hold Tyson liable for the harassment Plaintiff suffered. As such, summary judgment is not warranted here.

The framework for holding an employer liable for harassment perpetrated by an employee depends on the harasser's employment status with the employer. If the harasser is a high-level employee or officer, his harassing conduct is simply imputed to his employer. *See Faragher*, 524 U.S. at 789-90 (discussing *Meritor*). If the harasser is not an officer, but is a supervisor as compared to the plaintiff, then the employer is vicariously liable for the harassment unless (a) there was no tangible employment action taken against the plaintiff; and (b) the employer proves the elements of the affirmative defense crafted by the Supreme Court in *Faragher*. *See id.* at 807-08. As it relates to the application of this affirmative defense, the term "supervisor" is a term of art that carries a special meaning. *See Vance v. Ball State University*, 133 S.Ct. 2434, 2439 (2013). This distinction between "supervisor" and co-worker does not apply elsewhere. *See id.* ("We hold that an employee is a 'supervisor' **for purposes of vicarious liability under Title VII** ….") (bold added). In this case, the parties agree that Plaintiff was harassed by co-workers, not by a supervisor.

There are multiple ways to show an employer is liable for harassment perpetrated by an employee, even if the employee was not a supervisor. *See, e.g., Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) (discussing three such methods); *see also Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758 (1998) (citing Restatement (Second) of Agency, §219(2)). One method of showing an employer is liable for harassment perpetrated by a non-management level employee is to show the employer was negligent. *Adler¸* 144 F.3d at 673. Under the negligence method, the plaintiff must prove that the employer knew or should have known of the harassment and failed to adequately respond. *Id.* The employer's response was not adequate unless it was "proportional to the incident and reasonably calculated to end the harassment and

prevent any future harassing behavior." *Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1257 (10th Cir. 2003). Even if the plaintiff was never harassed again, the employer may be found liable for the harassment if its response was not otherwise reasonable. "Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care." *Smith v. Sheahan*¸189 F.3d 529, 535 (7th Cir. 1999).

a. **Proving an Employer's Constructive Knowledge, Generally**

An employer may be held liable for the continuation of harassment of which it had constructive knowledge but failed to stop. *Adler*, 144 F.3d at 673. As discussed in *Adler*, and cited by Tyson, one way of showing constructive knowledge is to demonstrate the harassment was so pervasive that management-level employees should have recognized it. *See id*.; *see also Defendants' Memo in Support* (Doc. 38) at 21. But that is not the only way to prove an employer's constructive knowledge.

An employer may be charged with knowledge of harassment "if information about the harassment came to the attention of someone who (a) has under the terms of his employment, or (b) is reasonably believed to have a duty to pass on the information to someone within the company who has the power to do something about it." *Sims v. Health Midwest Physician Services Corp.*, 196 F.3d 915, 919 (8th Cir. 1999), *quoting Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997) and *Torres v. Pisano*, 116 F.3d 116 F.3d 625, 636-38 (2nd Cir. 1997). In *Sims*, the Court found there was sufficient evidence of the employer's constructive knowledge to preclude summary judgment because an employee who knew about the harassment was duty-bound to further report the harassment. *See Sims*, 196 F.3d at 919. The same is true in this case.

### b. Tyson Should Have Known Richardson was a Sexual Harasser Before He Started Working with Plaintiff

Tyson admits that its company policy requires every employee to report harassment they witness, experience, or otherwise learn about, regardless of their position with the company. SOF ¶¶90-99. Before Richardson started working with Plaintiff for the first time on September 9, 2015, SOF ¶18, he worked in a different department with a female employee named Sharon Peoples. SOF ¶137. When Peoples worked with Richardson, things he said to her made her think that he was "creepy." SOF ¶136. HR Manager Simone Clifford, who was the highest-ranking HR employee in Kansas City at the time, SOF ¶114, interviewed Peoples during September 2015. SOF ¶135. Based on her interview, HR Manager Clifford concluded that peoples should have reported Richardson for sexual harassment when the two of them worked together. SOF ¶138. Accordingly, Tyson had constructive knowledge of Richardson's harassment of female employees before Plaintiff was forced to work with him.

### c. Tyson Should Have Known that Richardson was Sexually Harassing Plaintiff Prior to September 12, 2015

Tyson also should have known of Richardson's harassment prior to September 12, 2015 because she reported it to her Team Leads, her first line of supervision in the plant. Tyson argues that Plaintiff's multiple complaints to her Team Leads does not qualify as constructive knowledge because Team Leads are not "supervisors" as a matter of law because they cannot hire or fire employees. *Defendants' Memo in Support* (Doc. 38) at 22. Tyson's argument misses the mark, however, because the legal distinction between supervisor and co-worker, which depends on an employee's authority to take actions such as hiring and firing, only applies in the context of vicarious liability for harassment by the employee. *See Vance*, 133 S.Ct. at 2439. When it comes to an employer's constructive knowledge of harassment, the relevant focus should be whether the plaintiff complained to a higher-level employee who was obligated under company policy to

forward the plaintiff's complaint, or was reasonably expected to do so. *See Sims*, 196 F.3d at 919. Tyson's discussion of Team Leads not being "supervisors" for purposes of vicarious liability for harassment is a red herring which the Court should disregard.

Under Tyson company policy, Team Leads have a duty to forward complaints of sexual harassment they receive from subordinate employees. SOF ¶97. Plaintiff has always understood her Team Leads to be her supervisors, SOF ¶98, because they provide her direction, coaching, and instruction at work. SOF ¶99. Although those facts no longer make Team Leads "supervisors" for purposes of vicarious liability for sexual harassment after the Supreme Court's opinion in *Vance*, it does not mean Tyson can ignore their knowledge of the harassment and their obligation under company policy to report harassment they know about or receive complaints about. If Tyson policy was followed, Plaintiff's Team Leads would have reported the harassment Plaintiff was suffering from Richardson on September 9, 10, and 11. SOF ¶¶100-13. The failure of the Team Leads to forward Plaintiff's complaints on those days would allow a jury to hold Tyson liable for the harassment Plaintiff continued to suffer from Richardson each day she worked with him.

Plaintiff claimed that Richardson harassed her every day they worked together. SOF ¶118. HR Manager Clifford substantiated all of Plaintiff's allegations of sexual harassment. SOF ¶117. Accordingly, Clifford determined Richardson sexually harassed Plaintiff all three days they worked together. SOF ¶121. Clifford further concluded that Richardson violated the company's sexual harassment policy, SOF ¶¶124-25, which is modeled after federal law related to sexual harassment. SOF ¶¶92-95. In light of these facts, a jury could find Tyson liable for the harassment. Plaintiff reported the harassment to her Team Leads each day, the Team Leads failed to further her complaints, and the harassment continued each time. As such, a jury could find Tyson failed to exercise reasonable care in response to known sexual harassment.

### d. Tyson's Response to the Harassment after September 12, 2015 was Not Reasonable

Tyson acknowledges it received actual knowledge of the harassment on September 12, 2015, SOF ¶32, but argues that it cannot be held liable for the harassment because it exercised reasonable care by punishing Richardson for harassing Plaintiff and by protecting Plaintiff from any further harassment. Although Tyson's argument has curb appeal, it lacks foundation. Despite an appearance to the contrary, Richardson was never disciplined for his conduct toward Plaintiff. And the punishment he received for giving Cobb makes pictures was never enforced against him. Tyson also fails to recognize its failure to exercise reasonable care resulted in Richardson finding a new victim and has been harassing her for approximately one year. Unless a jury would be *required* to find Tyson exercised reasonable care, Tyson is not entitled to summary judgment.

An employer may only avoid liability for co-worker sexual harassment if it proves it took actions "reasonably calculated to end the harassment and prevent any future harassing behavior." *Scarberry*, 328 F.3d at 1257. To preclude summary judgment, Plaintiff does not have to prove Tyson's response was inadequate as a matter of law. *See Hoyle v. Freightliner, LLC¸* 650 F.3d 321, 335 (4th Cir. 2011).[4] Instead, Plaintiff only needs to present evidence a jury *could* believe and thereupon conclude Tyson failed to exercise reasonable care in response to the harassment. *Id.* When an employer has in place policies designed to remedy harassment and discrimination, but fails to apply them, a jury may conclude the employer did not respond to the harassment reasonably. *See Hoyle v. Freightliner, LLC¸* 650 F.3d 321, 335-36 (4th Cir. 2011). In this case, Tyson's actions violated its own policies designed to prohibit sexual harassment prohibited by

---

[4] Though not required to do so, Plaintiff filed a motion for partial summary judgment (Doc. 39) asking the Court to find that as a matter of law, Tyson failed to exercise reasonable care because it (1) rewarded Richardson; and (2) retaliated against Plaintiff. The evidence from Plaintiff's Motion and Suggestions in Support (Docs. 39, 40) is also included herein, but this response also includes much evidence not included in Plaintiff's motion for partial summary judgment.

federal law. Additionally, Tyson's argument that it is entitled to judgment as a matter of law is not supported by uncontroverted evidence, so its motion must be denied.

### i. Richardson was Never Disciplined for Harassing Plaintiff

Even though Tyson concluded Richardson sexually harassed Plaintiff, it never punished him for his misconduct toward Plaintiff. Rather, Richardson was rewarded for being reported for sexual harassment. HR Manager Clifford substantiated every allegation made by Plaintiff, SOF ¶¶114-18; ¶121, and concluded Richardson violated Tyson's sexual harassment policy. SOF ¶¶124-25. Even though Clifford issued Richardson a Level 3 Write-Up on September 14, 2015, SOF ¶157, the write-up had nothing to do with Plaintiff or Richardson's conduct toward Plaintiff. SOF ¶159. Notably, Richardson admitted he has not been punished for harassing Plaintiff.

Tyson recognizes that discipline towards employees is supposed to prevent unwanted behavior from reoccurring in the future. SOF ¶¶205-06. But discipline cannot curb behavior when the employee does not know the reason for discipline. Richardson believes he received the write-up solely for sending naked pictures to Kim Cobb outside of work, SOF ¶158, and the evidence supports his belief. The write-up itself makes no mention of Plaintiff or his conduct toward her. SOF ¶159. HR Manager Clifford also made no mention of Plaintiff or his conduct toward her when she issued him the write-up. SOF ¶160. Richardson had no idea the write-up was supposed to be for his conduct towards Plaintiff, and does not think he was ever punished for the way he acted toward Plaintiff. SOF ¶¶161-62. Thus, it is unsurprising Richardson continued to harass females.

### ii. Richardson was Rewarded for Sexual Harassment

Under Tyson's discipline policy, employees with an "active" write-up, are not allowed to obtain a transfer or raise at their own request. SOF ¶¶163-170. Richardson understands this to be Tyson policy, SOF ¶171, and Tyson acknowledges that giving an employee a raise is not an

effective form of discipline. SOF ¶172. Nevertheless, Richardson was rewarded for being reported by Plaintiff for sexual harassment. Tyson claims it transferred Richardson as a form of punishment for harassing Plaintiff, but its source of information is HR Manager Clifford. Tyson knows Clifford has credibility problems. *See* SOF ¶¶259-67. Moreover, Richardson's testimony revealed the true circumstances of his transfer to the warehouse.

Unbeknownst to Richardson, when he transferred into Plaintiff's department, his rate of pay was reduced. SOF ¶¶173-74. When he received his first paycheck and realized he received a pay cut, he complained to HR Manager Clifford about the reduction in his pay. SOF ¶175. This happened a few weeks after he received the Level 3 Write-Up. SOF ¶184. In response to his complaint about pay, Clifford told Richardson he would receive a raise if he requested a transfer to the warehouse. SOF ¶176. Richardson requested the transfer and received it, and got the raise. SOF ¶¶177-78. Richardson had no clue his transfer was supposedly a form of punishment for sexually harassing Plaintiff or for sending naked pictures to Cobb. SOF ¶¶179-84. As far as he knows, the sole reason he transferred was because he requested it so he could get a raise. SOF ¶185. Such a response to sexual harassment is unreasonable. Especially when the same employment benefits were not offered to Plaintiff (who also requested a raise) and enabled the harasser to acquire a new victim.

### iii.    Plaintiff was Not Offered the Same Opportunity as Richardson

While HR Manager Clifford was offering Richardson a higher paying job, she told Plaintiff her only option was to move to the day shift in the Raw Department, which would have resulted in a reduction in Plaintiff's pay. This was unreasonable as a matter of law. "The employer breaches the duty of care it owes to the harassed employee when the steps it takes in response to the harassment render her job demonstrably and significantly less rewarding or desirable." *Hostetler*

*v. Quality Dining, Inc.* 218 F.3d 798, 812 (7th Cir. 2000). "A transfer that reduces the victim's wage or other remuneration … is an inadequate discharge of the employer's duty of correction." *Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 365 (7th Cir.1990). "A victim of sexual harassment should not have to work in a less desirable location as a result of the employer's remedial plan." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994). Plaintiff was not only told she could only transfer if she accepted a pay cut, but she was never offered the more favorable job that was offered to the known harasser.

Within a few days of reporting the sexual harassment, Plaintiff asked Clifford for a transfer. SOF ¶247. Unlike the promotion she offered to Richardson, the "only" opening offered to Plaintiff was a job in a department that would have resulted in a decrease in pay. SOF ¶¶248-49. Despite the pay cut, Plaintiff asked for the transfer on September 16, 2015. SOF ¶250. But after Richardson transferred, Plaintiff withdrew her request. SOF ¶251. Plaintiff did not know Richardson transferred to the warehouse, SOF ¶252, and had no idea the job was even open, because Clifford never offered it to her. SOF ¶254. Although transferring an employee for making a complaint of can be considered retaliation if the employee opposes it, *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006), a transfer granted to an employee who requests it is not retaliation.

The case law above suggests that offering Plaintiff a lower-paying job was unreasonable as a matter of law. In addition, a jury could conclude that Tyson failed to exercise reasonable care because even though it concluded Richardson sexually harassed Plaintiff and Plaintiff requested a transfer, Tyson told Plaintiff she could only transfer if she took a pay cut, but it offered Richardson a transfer that came with a raise. Plaintiff did not rescind her request until after Richardson transferred, SOF ¶251, which means when Clifford offered the favorable transfer to Richardson, Plaintiff's transfer request was still pending. Notably, Richardson's presence near Plaintiff's

workspace was not the only reason Plaintiff requested the transfer, she also wanted to transfer because of the rumor-mill that started after her complaint. SOF ¶247. Plaintiff's concerns could have been alleviated had Clifford given Plaintiff the same job opportunity as she gave Richardson. Instead, Clifford chose not to offer Plaintiff a transfer to the better-paying job. That opportunity was instead reserved for the known sexual harasser.

Clifford's preferential treatment towards Richardson is not indicative of the exercise of reasonable care in response to sexual harassment in the workplace. A jury could find that Tyson did not act reasonably because its discovery of Richardson sexually harassing Plaintiff resulted in a benefit to Richardson, which was withheld from Plaintiff. Clifford's actions are consistent, however, with the threats she lodged toward Plaintiff, SOF ¶¶148-49; ¶¶153-56, and the sympathy she felt for Richardson. SOF ¶¶139-41. Clifford thought Plaintiff was "too sensitive" and felt sorry for Richardson, whom Clifford thought was the real victim. Her actions were a result of her beliefs, which a jury could find were unreasonable considering the evidence.

### iv. Plaintiff Continued to Work with Richardson

"Courts recognize the complainant's assignment to work in close proximity to harassers as a factor in assessing the reasonableness of the employer's remedial measures." *Hanna v. Boys and Girls Home and Family Services, Inc.*, 212 F.Supp.2d 1049, 1064 (N.D. Iowa 2002). Even though Richardson was moved around the facility, Plaintiff still interacts with him at work on a regular basis. SOF ¶200. Immediately after Plaintiff's complaint, Richardson was still going to the group huddles, where he would stare at Plaintiff in an intimidating manner. SOF ¶51. As recently as June 23, 2017, Richardson invaded Plaintiff's personal space a manner which intimidated Plaintiff and made her very nervous. SOF ¶¶203-04.

This evidence should factor into the Court's analysis, because a jury would likely consider it. Richardson's persistence in making Plaintiff uncomfortable at work is the natural and foreseeable consequence of Tyson's response to the sexual harassment it acknowledges occurred. When an employer agrees that one employee sexually harassed another, but rewards the harasser instead of punishing him, it emboldens the harasser. Why should he feel the need to change his conduct toward Plaintiff, when Plaintiff's complaint against him was resulted in him getting a raise? This factor alone may not be dispositive, but it creates an inference favorable to Plaintiff and should contribute to the Court's decision to deny Tyson's motion.

### v.    Retaliation Toward Corroborating Witnesses

Title VII prohibits retaliation against an employee for opposing sexual harassment. *See* 42 U.S.C. § 2000e-3(a). Thus, an employer who responds to complaints of sexual harassment with retaliation has not exercised reasonable care. Tyson admits that it prohibits retaliation against witnesses who support a complaint of sexual harassment. SOF ¶208. Tyson's policy defines retaliation in a manner consistent with Title VII, *see* SOF ¶209, and Tyson admits that write-ups a form of retaliation prohibited by its policy if they are motivated by a complaint of sexual harassment. SOF ¶210. More specifically, Tyson admits that writing up an employee for providing a truthful statement in an investigation into sexual harassment is retaliation. SOF ¶126. But that is precisely what HR Clifford did to three employees who corroborated Plaintiff's complaint.

Despite Tyson's policy which is intended to enforce federal law and protect both victims of sexual harassment and witnesses who come forward to corroborate allegations of sexual harassment, HR Manager Clifford issued written discipline to the witnesses who corroborated Plaintiff's allegations. On September 12, 2015 Jackie Smith and Alyssa Rollo wrote statements corroborating Plaintiff's claim regarding the pictures being shown to them. SOF ¶131; ¶133. In

response, Clifford issued them write-ups. SOF ¶142, ¶146. Clifford admitted she wrote them up simply for seeing the pictures. SOF ¶131; ¶133. Clifford did so even though she knew Smith was "disgusted" when Cobb showed her the pictures. SOF ¶143; ¶145. Clifford also admitted she only knew Smith saw the pictures because Smith provided a truthful statement during the investigation. SOF ¶142. Such conduct squarely runs afoul of Tyson's policy prohibiting retaliation. Clifford also interviewed a different female employee whom was identified by Plaintiff as a potential victim of Richardson, SOF ¶135, and after ashe provided information about Richardson's "creepy" conduct, SOF ¶136-38, she was also written-up for being shown the pictures. SOF ¶147.

Clifford's decision to write-up all the witnesses who corroborated Plaintiff's complaint of sexual harassment was not reasonably calculated to stop sexual harassment. A jury could reasonably conclude that Clifford's conduct was designed to deter complaints of sexual harassment and to deter employees from providing truthful witness statements. A jury could conclude Clifford disciplined the corroborating witnesses, SOF ¶151, and threatened their jobs, SOF ¶152, because she believed Richardson was the "victim" SOF ¶¶139-41, ¶149, ¶¶153-55, and Plaintiff was "too sensitive." SOF ¶156. Clifford's conduct is simply not an example of the type of reasonable care that entitles an employer to obtain summary judgment on a claim of sexual harassment.

### vi. Clifford's Immediate Retaliation Toward Plaintiff

Clifford's retaliation toward Plaintiff is discussed in depth later, but her immediate response to Plaintiff's complaint is relevant here as well. A jury could find Tyson failed to exercise reasonable care because the top HR employee at the facility reprimanded Plaintiff because she reported Richardson for sexual harassment. SOF ¶¶148-56. Clifford told Plaintiff that instead of reporting Richardson to her supervisors, she should have contacted Clifford directly through her personal cell phone. SOF ¶155. However, Plaintiff had previously reported racially-charged

language by texting Clifford about it, SOF ¶¶84-86, and even though Clifford admitted the conduct Plaintiff reported would have violated Tyson's policy prohibiting race discrimination, SOF ¶87, Clifford ignored the complaint. SOF ¶89. Clifford's response to Plaintiff's sexual harassment complaint has been consistent with the text she sent Plaintiff wherein she explained she prefers to handle workplace issues in a way that is not "incriminating to anyone." SOF ¶88.

An employer should not be found to have acted with reasonable care as a matter of law when part of its response to sexual harassment is to reprimand the Plaintiff for reporting it. Unlike cases where an employee receives general hostility or reprimands unrelated to a complaint, in this case, Clifford threatened Plaintiff <u>because she reported sexual harassment</u>. SOF ¶ 153-56. To grant Tyson summary judgment, the Court must conclude that the jury, acting reasonably, would be *required* to find Tyson exercised reasonable care in response to Plaintiff's complaint of sexual harassment. Clifford's immediate reaction to Plaintiff should preclude such a finding.

### vii.  Clifford's Failure to Follow Tyson Policy

When an employer has in place policies designed to remedy harassment and discrimination, but then fails to apply them to the circumstances of the case, a jury may conclude the employer did not respond to the harassment reasonably. *See Hoyle v. Freightliner, LLC¸* 650 F.3d 321, 335-36 (4th Cir. 2011). For example, failing to investigate a complaint of sexual harassment as required by company policy indicates the employer's response was not reasonable. *See id.* at 325. An employer who violates its own policies does not necessarily act unreasonably as a matter of law, but its refusal to follow its own policy is a factor that can be considered when determining if the employer exercised reasonable care in response to harassment. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, n.7 (4th Cir. 2015).

In addition to Clifford's policy violations relating to not Richardson's discipline, or lack thereof, which are set forth above, Clifford also failed to adequately investigate Plaintiff's complaint as required by Tyson policy. Tyson policy required Clifford to interview Plaintiff about her complaint, SOF ¶119, but she never did so. SOF ¶120. Clifford also never followed-up with any of the employees who wrote statements corroborating part of Plaintiff's complaint. SOF ¶¶129-30 (Vincent); ¶¶131-32 (Smith); ¶¶133-34 (Rollo). Instead, Clifford issued write-ups to them. While this fact is not dispositive, it weighs in favor of denying Tyson's motion.

### viii.     Richardson Started Harassing Another Female After His Reward

An employer may only avoid liability for co-worker sexual harassment if it proves it took actions "reasonably calculated to end the harassment and prevent any future harassing behavior." *Scarberry*, 328 F.3d at 1257. The evidence set forth above shows that Tyson did not exercise reasonable care to prevent Richardson from sexually harassing female employees in the future. Any doubt as to the reasonableness of Tyson's response should be eliminated because Richardson has been sexually harassing another female employee in a manner which is nearly identical to the way he harassed Plaintiff. It could be said that he did not "learn his lesson," but then again, he was never given the lesson because he was not actually punished for harassing Plaintiff, he was punished for giving Kim Cobb naked pictures of himself. And then he moved on to his next victim.

Ms. Gatson started working for Tyson in October 2015. SOF ¶186. She knows Richardson through work, SOF ¶187, and has been suffering sexual harassment from Richardson for more than one year. SOF ¶188. Richardson makes comments about Gatson's appearance, SOF ¶189, ¶191, stands very close to her, SOF ¶190, has asked for her number, SOF ¶192, talked about being a "dancer" and a "stripper," SOF ¶¶193-94, has sent her pictures of himself almost naked, SOF ¶195, and sent her sexual music. SOF ¶196. Richardson has also talked about a different victim

who also complained about his conduct. SOF ¶198. Richardson's conduct has caused Gatson to change the way she acts at work so she can avoid him. SOF ¶199. Tyson's response to Plaintiff's sexual harassment complaint was not reasonable because it enabled Richardson to move onto the next victim. Further harassment is the natural and probable consequence of ignoring harassment. Tyson's policies are designed to discipline harassers in a manner which deters future misconduct, SOF ¶¶163-71; ¶¶205-06, but in this case, Tyson did not follow its own policies.

### e. Two Competing, Yet Reasonable Narratives Creates a Jury Issue

Tyson has presented one version of events, *i.e.*, Plaintiff was harassed, she complained, and Tyson fixed the problem, end of story. But the evidence presented by Plaintiff tells a much different story. When Tyson's evidence is disregarded, and all the evidence and inferences are viewed in Plaintiff's favor, summary judgment should be denied. A jury could reasonably conclude that Tyson's response was unreasonable because it facilitated further harassment by Richardson, harmed Plaintiff, and intimidated witnesses. The sexual harassment claim should proceed to trial.

## II. **Tyson is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claims**

Title VII's anti-retaliation provision states, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice [by Title VII]." 42 U.S.C. § 2000e-3(a). The elements of a retaliation claim are: (1) the employee engaged in protected activity, (2) the employee suffered adverse actions, and (3) there is a causal connection between the two. *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008).

### a. Burden-Shifting Applies to Retaliation Claims Without Direct Evidence

The manner in which retaliation claims are analyzed depends on whether there is direct evidence or circumstantial evidence only. "[D]irect evidence of discrimination makes the

*McDonnell Douglas* approach unnecessary." *See, e.g., Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996). In the absence of direct evidence, the *McDonnell Douglas* burden-shifting framework is applied. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Under this framework, a plaintiff must first establish a prima face case. *Id.* A prima facie case shifts the burden of production to the employer, who must articulate a legitimate (i.e., not illegal) motivation for its actions. *Id.* Then the burden shifts back to the plaintiff to demonstrate the articulated reason is pretext. *See id.* at 515-16.

If the plaintiff establishes a prima facie case and the employer articulates a legitimate reason for its actions, the burden shifts back to the plaintiff to demonstrate the articulated reason is pretext. The methods of showing pretext are plentiful; "a plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007). "A plaintiff may show pretext by demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). The issue is whether the plaintiff presents evidence that *could* cause a reasonable juror to disbelieve the employer. *Id.* at 1180. If a jury *could* find the employer's proffered reason is false, then summary judgment should be denied. *See Reeves*, 530 U.S. at 147; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). If the plaintiff shows how a jury could disbelieve the employer, nothing more is needed to prevail. *Hicks¸* 509 U.S. at 511. Showing a jury *could* reject the employer's proffered reason precludes summary judgment. *Id.* The Tenth Circuit has squarely rejected a "'pretext plus' standard." *See Swackhammer*, 493 F.3d at

1167. "[A] plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." *Id.*

### b. The Requirement of a "Materially Adverse Action"

For some of the retaliation alleged by Plaintiff, instead of disputing the claim from a factual standpoint, Tyson simply argues its conduct does not qualify as retaliation. Specifically, Tyson argues that some of the conduct directed at Plaintiff because she opposed sexual harassment was not "materially adverse."

The second element of a retaliation claim is that the plaintiff suffered an adverse action. *Fye*, 516 F.3d at 1227. For a Title VII retaliation claim, the adverse action must have been "materially adverse." *Daniels v. UPS, Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). The challenged action does not need to adversely affect the terms or conditions of the plaintiff's employment. *Id.* "[T]he definition of a materially adverse job action for retaliation is broader than an adverse action for discrimination purposes." *Tucker v. Aramark Corp.,* No. 13-2574-JTM, 2015 WL 78188, *13 (D.Kan. Jan. 6, 2015). Any act that produces "an injury or harm" can be actionable retaliation under Title VII. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). The issue is whether the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. Any act that could "discourage an employee" from reporting discrimination meets the threshold. *Id.* at 70-71.

Actions falling much short of termination can qualify as retaliation. In *White*, the Supreme Court held that unwanted "reassignment of job duties" can be "materially adverse." *White*, 548 U.S. at 71. Changing an employee's job against her will could easily be considered discouraging conduct. *See id.* Courts have also found disciplinary actions to qualify as retaliation. For example, written discipline may constitute an adverse action for retaliation purposes. *See Roberts v.*

*Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998)[5] (citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997). The Tenth Circuit recognizes that being "written up" can mark the beginning of a retaliatory pattern. *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996). The law recognizes write-ups to be materially adverse actions that can support a retaliation claim. *Nordike v. Verizon Bus., Inc.*, No. 12-2686-JAR, 2014 WL 4749185, at *15 (D. Kan. Sept. 24, 2014). This is because written discipline is designed to effectuate a change in behavior.

**c. The Write-Up Issued to Plaintiff for Conduct Occurring on February 2, 2016**

Plaintiff withdraws her claim that the write-up she received for the conduct she engaged in on February 2, 2016 was retaliatory.

**d. The Write-Up Issued to Plaintiff on October 10, 2016**

This Write-Up was issued to Plaintiff after she filed her second Charge of Discrimination, SOF ¶81, which formed the basis for her First Amended Complaint filed on October 26, 2006. *See* SOF ¶83. As such, Plaintiff withdraws her claim of retaliation based on this write-up. However, as discussed below, the circumstances surrounding the write-up corroborates Plaintiff's other retaliation claims, and should be considered accordingly. Evidence of illegal discrimination, even if not exhausted by filing a complaint with the EEOC, is admissible to support a claim that is properly before the Court. *See, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2d Cir. 2005); *see also National RR Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) (discussing

---

[5] *Roberts* was decided in 1998, eight years before the Supreme Court decided *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006), which changed the standard for Title VII retaliation cases from "adverse employment action" to "materially adverse action." Even under the heightened "adverse employment action" standard, *Roberts*, 149 F.3d at 1103, the Tenth Circuit held that write ups could be retaliatory. *Id.* at 1104.

"background evidence"); *Lyons v. England*, 307 F.3d 1092, 1108 (9th Cir. 2002) (discussing impact of *Morgan* on admissibility of evidence of time-barred claims).

**e. Simone Clifford's Intimidation and Threats Toward Plaintiff**

Clifford threatened and intimidated Plaintiff because she reported Richardson for sexual harassment. Tyson's only defense to this retaliation claim is that the threats and intimidation do not qualify as materially adverse actions. *Defendants' Memo in Support* (Doc. 38) at 33. To hold that threats of discipline and intimidation cannot, as a matter of law, dissuade employees from reporting harassment would be to disregard both common sense and Tyson's own testimony.

Tyson's policy prohibits retaliation in a way which mirrors federal law. *See* SOF ¶92. To that end, it defines "retaliation" in a manner consistent with Title VII. *See* SOF ¶209. Tyson's argument that threats and intimidation do not qualify as retaliation under the law is disingenuous considering its admission that such conduct would violate its policy against retaliation. *See* SOF ¶148. Undoubtedly, a violation of company policy does not equate to a violation of the law. But when a company admits that certain conduct violates its policy, which was written to mirror the law, it should be precluded from obtaining summary judgment based on a legal argument that directly contradicts its admission. In addition, contrary to its legal argument, Tyson's evidence shows that verbal warnings *can* dissuade employees from repeating conduct in the future.

Tyson acknowledges its discipline policy is designed to curb unacceptable behavior from employees. SOF ¶¶205-06. Under Tyson's discipline policy, the first step is a "verbal" warning, *see Exhibit 14*, also known as a "documented conversation," which gets recorded in writing *see, e.g., Exhibit 4*, and gets placed in an employee's personnel file. SOF ¶240. Tyson's legal argument that threats or intimidation cannot dissuade an employee from engaging in unwanted behavior is undermined by its own policy. Tyson implemented the policy for the sole purpose of effectuating

change in the behavior of its employees. If, as a matter of law, threats and intimidation are not retaliation, then Tyson would be free to change its policy so tell employees, "If you report sexual harassment, you will be yelled at, berated, intimidated, threatened with write-ups and termination, and we will try to make you feel guilty for causing discomfort to the employee who sexually harassed you." According to Tyson's argument, such a policy would be permissible even though it would directly undermine the purpose of Title VII's prohibition of retaliation.

There should be no doubt that warnings and threats dissuade behavior. Teachers reprimand students before seeking expulsion. Police officers issue written warnings before writing tickets. Judges reprimand attorneys for engaging in misconduct in their court rooms before having them arrested for contempt. Verbal reprimands, intimidation, and threats are carried out for the sole purpose of changing another person's behavior. If the Court agrees, summary judgment must be denied, because Tyson has offered no legitimate explanation for the threats made to Plaintiff.

Clifford's threats and intimidation toward Plaintiff constitute direct evidence of retaliation, obviating the need to engage in burden-shifting. The content of the threats directly shows the sole reason they were made to Plaintiff was because she reported sexual harassment. *See* SOF ¶¶153-56. Even if the burden-shifting model applied, Tyson has not offered any legitimate, non-retaliatory reason for Clifford's actions. As such, the burden does not shift back to Plaintiff to demonstrate pretext. This part of Plaintiff's retaliation claim should proceed to trial, unless the Court finds that as a matter of law, no reasonable juror could find threats could have the effect of dissuading an employee from repeating the conduct for which she was threatened for engaging in.

### f. Two Write-Ups on October 26, 2015 for Pre-Complaint Conduct

On October 26, 2015, Tyson issued Plaintiff two write-ups for conduct that occurred prior to her complaints of sexual harassment. SOF ¶¶220-25. Tyson's only defense to these claims of

retaliation are that they were not exhausted through the administrative process. Even though Plaintiff did not specifically identify the two write-ups on October 26, 2015, the Charge of Discrimination Plaintiff filed on July 14, 2016 states, "…I have been picked on an [sic] written up just because I reported sexual harassment." *See* Doc. 15-3 (Exhibit C to Plaintiff's First Amended Complaint). Tyson cites cases holding that events taking place *after* the Charge was filed are not properly before the Court, *see Defendants' Memo.* (Doc. 38) at 29-30, but Tyson does not cite any cases to show Plaintiff's reference to being "written up just because [she] reported sexual harassment" is insufficient to preserve her present claim that the write-ups were retaliatory. *Id*. To the contrary, the law suggests Plaintiff's charge was sufficient to pursue these retaliation claims.

"Courts liberally construe charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." *Noland v. City of Albuquerque*, 779 F.Supp.2d 1214, 1230-31. The claims that can be pursued in a lawsuit are "limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge." *Id.* at 1231. "The charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim." *Id.* at 1233. Under these guideposts, the Court should find that Plaintiff's charge preserved her claim that she was retaliated against in the form of write-ups.

Even though Plaintiff did not specifically mention the October 26, 2015 write-ups in the charge, she alleged she had "been picked on an [sic] written up just because [she] reported sexual harassment." *See* Doc. 15-3. With such an allegation, it should be reasonably expected that the administrative investigation would encompass all write-ups issued within close proximity to the sexual harassment complaint referenced. Here, the write-ups at hand were issued just weeks after Plaintiff's sexual harassment complaint and initial EEOC charge. Moreover, Tyson issued Plaintiff

the write-ups as a direct result of a conversation where Plaintiff's first EEOC Charge was discussed. *See* SOF ¶¶211-18. As such, Tyson cannot claim it has been prejudiced by the October 26, 2015 write-ups not being explicitly mentioned in the Charge. If the Court finds the Charge sufficiently references write-ups as a form of retaliation, then summary judgment is not warranted for the two October 26, 2015 write-ups. Plaintiff can make a prima facie case, and Tyson has not offered a legitimate reason for issuing them to Plaintiff.

The elements of a retaliation claim are: (1) the employee engaged in protected activity, (2) the employee suffered adverse actions, and (3) there is a causal connection between the two. *Fye*, 516 F.3d at 1227. The evidence before the Court makes a prima facie case for the write-ups issued to Plaintiff on October 26, 2015.

### i.  Protected Activity

It is undisputed that Plaintiff complained of sexual harassment on September 12, 2015, SOF ¶32, and filed a Charge of Discrimination on October 2, 2015. SOF ¶79. Clifford received a copy of the Charge on October 15, 2015, SOF ¶212. These facts establish the first element.

### ii.  Materially Adverse Action

Write-ups qualify as retaliation, both according to the Tenth Circuit, *see Roberts*, 149 F.3d at 1104; *Marx* 76 F.3d at 329; *Nordike* 2014 WL 4749185, at *15, and to Tyson's corporate representative. SOF ¶¶205-10. It is undisputed that Plaintiff received two write-ups on October 26, 2015. *See* SOF ¶¶211-25. These facts establish the second element.

### iii.  Causal Connection

"For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action." *Fye*, 516 F.3d at 1228. In *Fye*, the protected activity occurred "less than two weeks" before the adverse

action, which "alone [was] sufficient to establish a causal connection between [the] protected activity and termination." *Id.* the Tenth Circuit has also held that 24 days is close enough to make a prima facie case without any additional evidence. *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

October 26, 2015 was 44 days after she reported sexual harassment internally on September 12, 2015, but only 11 days after October 15, 2015, which was when Clifford found out that Plaintiff filed an EEOC Charge making specific allegations against Clifford. *See* SOF ¶¶212-14. The timing alone should make a prima facie case of retaliation for these alleged acts of retaliation.

### iv. <u>Evidence of Pretext</u>

Tyson has not offered a legitimate explanation as to why Plaintiff was written-up twice on October 26, 2015 for conduct that was addressed prior to her protected activities. Regardless, the following is sufficient evidence of pretext.

The discussion between Erickson and Clifford demonstrate the pretextual nature of Clifford's presentation of the write-ups to Plaintiff on October 26, 2015. On October 25, 2015, Clifford sent a proposed write-up intended for Plaintiff to her boss Erickson for approval, because Plaintiff had filed an EEOC charge based on the harassment. SOF ¶¶215-17. In response, Erickson asked Clifford to provide all documented discipline in Plaintiff's file. SOF ¶218. Plaintiff had been suspended in May 2015 for conduct that she was never written-up for, but Clifford issued her a write-up for it on October 26, 2015. SOF ¶¶219-20. The only reason Erickson was involved was because Plaintiff filed an EEOC Charge. SOF ¶216. And that was the only reason Plaintiff was issued a write-up for the conduct on October 26, 2015. Clifford admitted there is no legitimate reason to issue discipline six months after an employee has already been disciplined. SOF ¶222.

Tyson has also offered no legitimate explanation for issuing Plaintiff the other write-up on October 26, 2015. The second write-up was also for conduct that had been addressed previously, in early September, prior to Plaintiff's protected activities. SOF ¶224-25. When an employee is written-up for pre-complaint conduct, but not until after making the complaint, it seems suspicious. Moreover, Clifford's comments reveal her retaliatory motive also demonstrate pretext.

Comments revealing an illegal motive for an employment action have been recognized as evidence of pretext, even if the comments fall short of being direct evidence. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). In this case, Clifford's comments suggest she had ulterior motives for issuing Plaintiff post-hoc discipline for pre-complaint conduct. First, the comments Clifford made directly toward Plaintiff should be considered evidence of pretext because they reveal a retaliatory motive. *See* SOF ¶¶154-56. Clifford had written-up every female employee who corroborated Plaintiff's complaint, SOF ¶151, threatened to fire them, SOF ¶152, and then told Plaintiff that she should also be written-up. SOF ¶153. Clifford admitted in her deposition that her true belief is that every employee who saw the pictures should have been disciplined, SOF ¶150, which would include Plaintiff. Clifford simply believed it was unfair that Plaintiff was not disciplined for seeing the pictures, even though that was part of the harassment she complained of. *See* SOF ¶31(a-e). Additionally, Clifford's comments related to the October 10, 2016 write-up that Plaintiff received shed light on Clifford's belief that anything Plaintiff did wrong was an "opportunity" to discipline her. SOF ¶¶237-46. The evidence shows Clifford was angry because Plaintiff was not disciplined more severely, and it was an "opportunity" to punish Plaintiff. SOF ¶¶241-46. Her comments reveal a retaliatory motive and provide evidence of pretext for any adverse actions taken against Plaintiff that she was involved in.

Based on the foregoing, Tyson is not entitled to summary judgment on Plaintiff's claim that the two write-ups she received on October 26, 2015 were acts of retaliation. There is sufficient evidence for a jury to conclude they were issued to Plaintiff because she reported sexual harassment, and to reject any legitimate explanation Tyson offers.

**g. The Write-Up for the "50-Minute Lunch Break"**

The final act of retaliation that should proceed to trial is the write-up Plaintiff received on April 29, 2016 for allegedly taking a "50-minute lunch break." SOF ¶226. Tyson claims Plaintiff cannot make a prima facie case of retaliation for this write-up because there is no evidence of a causal link between her protected activity and the write-up. *Defendants' Memo* (Doc. 38) at 35-37. Tyson's argument fails to view all the evidence in Plaintiff's favor and it disregards the low threshold for making a prima facie case.

When analyzing the plaintiff's prima facie case, the Court should not consider any of the moving party's evidence. *See Ellison v. Sandra Nat'l Laboratories*, 60 Fed.Appx. 203, 205 (10th Cir. 2003) (unpublished). The employer's evidence should only be considered in the second and third steps. *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469-70 (10th Cir. 1992). "At the prima facie stage of the *McDonnell Douglas* analysis, a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1193 (10th Cir. 2000). The threshold for making a prima facie case is very low. *See Orr v. City of Albuquerque*, 417 F.3d 1144, (10th Cir. 2005).

An inference that Plaintiff received the write-up for taking a long bathroom break is demonstrated by Clifford's comments. First, Clifford's comments to Plaintiff and her admission that she thought Plaintiff should have been punished for being victimized by the naked pictures is

alone evidence to demonstrate Clifford's retaliatory motive against Plaintiff. Moreover, Clifford's emails from October 2016 reveal that she believes any mistake made by Plaintiff is an "opportunity" to discipline Plaintiff, which should sufficiently cast doubt on the sincerity of any discipline issued to Plaintiff that Clifford was involved in, such as the write-up about the 50-minute lunch break. *See* SOF ¶¶233-34 (showing Clifford was involved). Clifford's email about the "missed opportunity" reveals a retaliatory motive when coupled with the fact that when Plaintiff received the write-up, the Plant Manager told Plaintiff that "they" wanted Plaintiff to be fired. *See* SOF ¶232. Although he did not identify "they" at the time, the evidence shows he was referring to Clifford and her assistant Susan Fox, who discussed firing Plaintiff for the allegedly long lunch break. *See* SOF ¶¶233-34. This evidence meets the low threshold of the prima facie case. In addition, Tyson is not entitled to summary judgment because Plaintiff can demonstrate the pretextual nature of the write-up.

A plaintiff can show pretext by showing that the employer's "explanation was false." *Reeves*, 530 U.S. at 144. Tyson claims it issued Plaintiff the write-up because Plaintiff took a 50-minute lunch break, SOF ¶226, which Plaintiff claims did not happen. SOF ¶227. Moreover, the testimony of HR Manager Clifford shows that Plaintiff's conduct did not violate any company policy. Plaintiff was working in the mezzanine, where it is warm, and when she was sent to work on the production floor, where it is cold, she stopped in the locker room to add a layer of clothing and use the restroom. SOF ¶227. Plaintiff was allowed to use the bathroom and did not need to ask for permission. SOF ¶¶228-29. Moreover, if Plaintiff happened to be in the bathroom when lunch was called, she was allowed to take the full lunch break. SOF ¶230. Even though Clifford said that Plaintiff's should have told her supervisor she was in the bathroom when break was called before taking her lunch break, SOF ¶230, Plaintiff was not disciplined for failing to notify her supervisor.

SOF ¶231. The write-up was issued for the alleged length of Plaintiff's break. The write-up itself also claims that Plaintiff left the production floor at 6:36, SOF ¶235, but Plaintiff was not on the production floor at all. SOF ¶236. Based on the foregoing, Plaintiff was written-up for conduct that does not violate Tyson policy, and her write-up was premised on false information. When this evidence is considered with other evidence of Clifford's retaliatory animus, a jury could find Tyson's explanation is pretext for retaliation, and return a verdict in Plaintiff's favor. Tyson's motion should be denied.

## CONCLUSION

Based on the foregoing, Plaintiff's claims of sexual harassment and retaliation should proceed to a jury trial. The material facts set forth by Tyson are genuinely disputed. Moreover, Plaintiff has offered additional material facts which create questions of fact regarding the reasonableness of Tyson's response to the harassment and the motive for the acts taken against Plaintiff following her sexual harassment complaints. Accordingly, Defendant's Motion for Summary Judgment (Doc. 37) should be DENIED.

*Respectfully Submitted*,

By:/s/ *Kenneth D. Kinney*
    Kenneth D. Kinney, D.Kan. #78544    Kirk D. Holman, KS Bar #19558
    **RALSTON KINNEY, LLC**    **HOLMAN SCHIAVONE, LLC**
    4717 Grand Avenue, Suite 250    4600 Madison Avenue, Suite 810
    Kansas City, Missouri 64112    Kansas City, Missouri 64112
    Tel: (816) 298-0086    Tel: (816) 283-8738
    Fax: (816) 298-9455    Fax: (816) 283-8739
    Email: ken@rklawllc.com    Email: kholman@hslawllc.com

**ATTORNEYS FOR PLAINTIFF**

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on, a true and correct copy of the above and foregoing and all exhibits referenced herein were filed through the Court's electronic filing system, which sends notice to all parties of record.

/s/ *Kenneth D. Kinney*
**Attorney for Plaintiff**